Yael Tobi (SBN 231425)
ytobi@munckwilson.com
William A. Munck (*Pro Hac Vice Forthcoming*)
wmunck@munckwilson.com
Ursula Smith (*Pro Hac Vice Forthcoming*)
usmith@munckwilson.com
**MUNCK WILSON MANDALA, LLP**
1925 Century Park East, Suite 2300
Los Angeles, California 90067
Telephone:   (310) 855-3311
Facsimile:   (972) 628-3616

Attorneys for Plaintiff
Canoo Technologies, Inc.

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| Canoo Technologies, Inc., a Delaware Corporation,<br><br>        Plaintiff,<br><br>    v.<br><br>Harbinger Motors, Inc., a Delaware Corporation; Electron Transport Inc., a Delaware Corporation; John Henry Harris; William Eberts; Phillip Weicker; Alexi Charbonneau;  Michael Fielkow; Benjamin Dusastre; Overture Climate VC; Schematic Ventures, LLC; Tiger Global Management, LLC; Ridgeline Partners, LLC; Bharat Forge Limited; Ironspring, LLC; Jackson Moses; Thor Industries, Inc.; and DOES 1 through 100,<br>        Defendants. | Case No.<br><br>**COMPLAINT FOR:**<br><br>1) **MISAPPROPRIATION OF TRADE SECRETS IN VIOLATION OF THE DEFEND TRADE SECRETS ACT, 18 U.S.C. § 1836, et seq.**<br>2) **MISAPPROPRIATION OF TRADE SECRETS IN VIOLATION OF THE CALIFORNIA UNIFORM TRADE SECRETS ACT, Cal. Civ. Code. § 3426.1**<br>3) **BREACH OF THE CONFIDENTIALITY INFORMATION AND INVENTIONS ASSIGNMENT AGREEMENT**<br>4) **BREACH OF THE EMPLOYEE SEPARATION INFORMATION LETTER**<br>5) **INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS** |

6) NEGLIGENT INTERFERENCE WITH CONTRACTUAL RELATIONS
7) TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE
8) NEGLIGENT INTERFERENCE WITH PROSPECTIVE ECONOMIC RELATIONS
9) BREACH OF FIDUCIARY DUTY
10) AIDING & ABETTING BREACH OF DUTY OF LOYALTY
11) BREACH OF DUTY OF LOYALTY
12) AIDING & ABETTING BREACH OF DUTY
13) FRAUD IN THE INDUCEMENT OF THE CONFIDENTIALITY INFORMATION AND INVENTIONS ASSIGNMENT AGREEMENT
14) FRAUD IN THE INDUCEMENT AS TO THE SEPARATION INFORMATION LETTER
15) UNFAIR COMPETITION IN VIOLATION OF CAL. BUSINESS AND PROFESSIONS CODE. § 17200 ET SEQ.
16) UNJUST ENRICHMENT
17) SPECIFIC PERFORMANCE

DEMAND FOR JURY TRIAL

Plaintiff Canoo Technologies, Inc. ("Plaintiff" or "Canoo"), by and through its undersigned counsel, hereby files this Original Complaint for damages and injunctive relief, as follows:

### INTRODUCTION

1.      This is a case of corporate espionage by a group of serial grifters who infiltrated Canoo to steal its intellectual property (including its confidential information and trade secrets) and human capital to create Defendant Harbinger Motors, Inc. ("Harbinger"), now a direct competitor of Canoo in the fiercely competitive marketplace for Electric Vehicles ("EV").[1]

2.      Defendants Phillip Weicker ("Weicker"), William Eberts ("Eberts"), John Harris ("Harris"), and Alexi Charbonneau ("Charbonneau")—former colleagues at Faraday & Future, Inc. ("Faraday")—always intended to own and control their own EV company.  And they were determined to do so without letting anything get in their way.  So when Weicker and Charbonneau left Faraday to join Canoo, where Eberts later joined, it was merely a stopping point, not a final destination.[2]

3.      As such, when Canoo required Weicker, Charbonneau, and Eberts (like all employees) to execute broad confidentiality and invention assignment agreements, they never had any intention of honoring those commitments, knowing

---

[1] Canoo's allegations of intellectual property theft involve national security concerns. Canoo's intellectual property forms the basis for contracts that Canoo secured with both NASA (to provide crewed transportation vehicles for Artemis lunar exploration launches) and with the United States Army (to provide light tactical vehicles).  The capabilities and vulnerabilities of Canoo's intellectual property, now in the hands of Harbinger, could prove beneficial to adversaries of the United States Government. Harbinger has at least one foreign investor that may have access to Canoo's stolen intellectual property.

[2] It is telling that Harris never joined Canoo, and that Eberts left Canoo eleven months after joining.  Both knew that they would later join Weicker and Charbonneau at Harbinger.

full well Harbinger was on their horizon.  Weicker, Charbonneau, and Eberts always intended to control the intellectual property they developed (and steal Canoo's confidential information) once they left Canoo.  And that's exactly what happened. In all, Weicker, Charbonneau, and Eberts misappropriated vast amounts of Canoo's financial resources, business plans, human capital, trade secrets, and other intellectual property, and conspired with Harris (who was employed elsewhere) to form Harbinger using Canoo's stolen intellectual property.[3]

4. Canoo develops cutting-edge technology in the EV space, including an independent driving platform referred to as a "skateboard" ("Skateboard Technology").[4]  Canoo's key trade secrets are imbedded in its Skateboard Technology, which can be used to convert gas-powered vehicles to electric at minimal cost.  Canoo has invested considerable time, human resources, and hundreds of millions of dollars to develop its Skateboard Technology, which has given Canoo a crucial technological edge in the EV market.

5. After developing its Skateboard Technology, Canoo invested heavily in building business plans to commercialize its EV technology.  Canoo retained a world-renowned consulting firm to assist Canoo in formulating, vetting, and proving a business plan centered solely around its Skateboard Technology (the "Skateboard Business Plan").  Canoo's Skateboard Business Plan included exploring joint venture opportunities with third-party original equipment manufacturers ("OEM")— including Morgan Olson ("MO")—who could integrate Canoo's driving platform

---

[3] This is not the first time Eberts, Weicker, and Charbonneau have been linked to allegations of trade secret misappropriation. Four years ago, they were key players in a virtually identical trade secret misappropriation scheme involving their former employer's EV technology.

[4] Canoo owns a wide array of intellectual property including that associated with its Skateboard Technology.  Canoo invests significant resources in developing and protecting its global, market-focused intellectual property portfolio, which includes trade secret, patent, copyright, trade dress, and contractual programs.  Canoo's IP programs are interleaved and complimentary to one another.

into their pre-existing fleet of vehicles.  Over the course of a year and a half, Canoo negotiated a potential partnership with MO.

6.     Weicker, Eberts, Harris, and Charbonneau conspired, stole and misappropriated Canoo's Skateboard Technology and Skateboard Business Plan for Harbinger's use and benefit, enabling Harbinger to develop a business model targeting OEM partnerships (like **Canoo**) using a skateboard driving platform (like **Canoo**) developed by former employees **from Canoo**.[5]  Harbinger's illicit scheme has proven to be a financial success, as Harbinger recently announced its own highly profitable joint venture with MO.[6]

7.     This is not a case where a couple of employees left a company to work for a competitor.  This is far worse.  Using Canoo's confidential information and trade secrets related to Canoo's employees, including their skills and training, Harbinger (through Eberts, Weicker, Charbonneau, and Harris) strategically recruited at least 33 of Canoo's employees to join Harbinger, making up approximately 66% of Harbinger's total workforce.[7]

_____

[5] Indeed, many of Canoo's former employees who now work for Harbinger are pursuing intellectual property protection for trade secrets, patentable inventions, original works of authorship, trade dress, and designs that Canoo believes belong to (or are based upon) Canoo's trade secrets and confidential and proprietary information. These former Canoo employees are contractually precluded from disclosing, using, or discussing Canoo's confidential information and trade secrets. Canoo is therefore the rightful owner of these misappropriated intellectual property assets.

[6] As Weicker was instrumental in the negotiations and exploration of Canoo's relationship with MO, Weicker, Charbonneau, and Harbinger sabotaged Canoo's relationship with MO while using Canoo's confidential information and Skateboard Business Plan to assist Harbinger in forming this joint venture with MO.

[7] Defendant Michael Fielkow ("Fielkow") merits particular scrutiny.  Fielkow served as Deputy General Counsel for Canoo for three years and had intimate knowledge of Canoo's intellectual property portfolio and global business development plans. Rising within the company to Vice President, Canoo trusted Fielkow to provide

8. In sum, Canoo's Skateboard Business Plan is the foundation of Harbinger's operations, and Canoo's intellectual property is the foundation of Harbinger's driving platform. By misappropriating Canoo's intellectual property and building a team consisting of Canoo's key former employees (like Defendants Charbonneau, Fielkow, and Jigar Patel ("Patel")), Harbinger was able to raise millions of dollars, attracting investors who were willing to turn a blind eye to such misconduct to enjoy a shortcut to success. The Harbinger investors were given an opportunity to invest in a ready-made EV company and bypass the significant time, design failures, and money necessary to independently develop a sophisticated EV company.

9. Canoo therefore brings this action to stop Defendants' illegal conduct and redress the harm caused to Canoo.

## PARTIES

10. Canoo Technologies, Inc. is an electric vehicle designer and manufacturer. Canoo maintains its headquarters in Torrance, California. Canoo owns all of the patents, trade secrets, and confidential information infringed or misappropriated by Harbinger.

11. Plaintiff is informed and believes, and on that basis alleges, that Defendant Electron Transport Inc., ("Electron") is a Delaware Corporation with a principal place of business in Los Angeles County, California.

12. Defendant Harbinger Motors, Inc. is a manufacturer of electric vehicles. Harbinger maintains its principal place of business in California.

13. Defendant John Henry Harris is the Chief Executive Officer and a co-

---

counsel free of fraud, theft, and divided loyalty. Fielkow grossly abused that trust, stealing untold amounts of Canoo's privileged documents and communications, intellectual property, and even misrepresenting on several occasions that he would not join a competitor. Fielkow's actions are particularly egregious when measured against the conduct of a licensed attorney, now Harbinger's General Counsel, Secretary and Head of Corporate Development.

founder of Harbinger.  Plaintiff is informed and believes, and on that basis alleges, that Harris is doing business in California and is a resident of the State of California.

14.    Defendant Benjamin Dusastre is an executive officer at Harbinger. Plaintiff is informed and believes, and on that basis alleges, that Dusastre is doing business in California and is a resident of the State of California.

15.    Defendant William Eberts is the Chief Operating Officer and a co-founder of Harbinger.  Prior to joining Harbinger, Eberts managed Canoo's battery, powertrain, and power electronics division from September 2018 to July 2019. Plaintiff is informed and believes, and on that basis alleges, that Eberts is doing business in California and is a resident of the State of California, residing in Los Angeles County.

16.    Defendant Phillip Weicker is the Chief Technology Officer and a co-founder of Harbinger.  Prior to joining Harbinger, Weicker worked at Canoo as the engineer in charge of Canoo's powertrain and electronics systems division, a position he held from December 2017 to December 2020.  Plaintiff is informed and believes, and on that basis alleges, that Weicker is doing business in California and is a resident of the State of California, residing in Los Angeles County.

17.    Defendant Alexi Charbonneau is the Vice President of Structures and Chassis at Harbinger.  From December 2017 to December 2021, Charbonneau was employed by Canoo as an engineer in charge of Canoo's skateboard and cabin systems.   Plaintiff is informed and believes, and on that basis alleges, that Charbonneau is doing business in California and is a resident of the State of California, residing in Los Angeles County.

18.    Defendant Michael Fielkow is the General Counsel and Head of Corporate Development at Harbinger.  From April 2019 to March 2022, Fielkow was employed by Canoo as Deputy General Counsel and Vice President of Corporate Legal, Securities, and Global Strategies.  Plaintiff is informed and believes, and on that basis alleges, that Fielkow is doing business in California and is a resident of the

State of California, residing in Los Angeles County.

19.    Eberts, Weicker, Charbonneau, and Fielkow are collectively referred to herein as the "Former Canoo Employees."

20.    Defendant Overture Climate VC ("Overture") is an early-stage venture fund headquartered in Los Angeles California.  Plaintiff is informed and believes, and on that basis alleges, that Overture invested in Harbinger.

21.    Defendant Schematic Ventures, LLC ("Schematic Ventures") is a venture capital fund headquartered in San Francisco, California.  Plaintiff is informed and believes, and on that basis alleges, that Schematic Ventures invested in Harbinger.

22.    Defendant Ridgeline Partners, LLC ("Ridgeline") is a venture capital firm headquartered in Los Angeles, California.  Plaintiff is informed and believes, and on that basis alleges, that Ridgeline invested in Harbinger.

23.    Defendant Jackson Moses ("Moses") is an individual residing in the State of Colorado.  Plaintiff is informed and believes, and on that basis alleges, that Moses invested in Harbinger.

24.    Defendant Ironspring, LLC ("Ironspring") is a venture capital fund headquartered in Austin, Texas.  Plaintiff is informed and believes, and on that basis alleges, that Ironspring invested in Harbinger.

25.    Defendant Tiger Global Management, LLC ("Tiger Global") is an investment firm headquartered in New York, New York.  Plaintiff is informed and believes, and on that basis alleges, that Tiger Global invested in Harbinger.

26.    Defendant Bharat Forge Limited ("Bharat Forge") is a foreign technology company headquartered in Pune, Maharashtra, India.   Plaintiff is informed and believes, and on that basis alleges, that Bharat Forge invested in Harbinger and has access to the intellectual property stolen from Canoo.  Such access by a foreign entity involves national security concerns because Canoo's trade secrets (which serve as a basis for Canoo's contracts with NASA and the United States Army)

could either be (i) used to either directly harm the United States Government, or (ii) provided and/or sold to adversaries and foreign governments, including near-peer competitors like China and Russia.

27.     Defendant Thor Industries, Inc. ("Thor Industries") is an investment firm headquartered in Elkhart, Indiana.  Plaintiff is informed and believes, and on that basis alleges, that Thor Industries invested in Harbinger.

28.     Overture, Schematic, Ridgeline, Moses, Ironspring, Tiger Global, Bharat Forge, and Thor Industries shall collectively be referred herein as the "Harbinger Investor Defendants."

## JURISDICTION AND VENUE

29.     This Court has jurisdiction over this matter pursuant to 18 U.S.C. § 1836(c) and 28 U.S.C. §§ 1331, 1367.  Canoo's claims arise, in part, under federal law, specifically the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1831 *et seq*.

30.     This Court has supplemental jurisdiction over Canoo's state law claims pursuant to 28 U.SC. § 1367 because those claims are so related to Canoo's federal claims that they form part of the same case or controversy.

31.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this judicial district and some of the defendants reside in, do business in, and maintain a principal place of business is in this jurisdiction.

32.     This Court has *in personam* jurisdiction over Defendants.   In the agreements that are the subject of this action, the Former Canoo Employees voluntarily and intentionally submitted to the exclusive jurisdiction of the courts in Los Angeles County, California.  The Harbinger Investor Defendants have engaged in continuous, regular, and systematic relations with this jurisdiction, including but not limited to doing business and investing in this jurisdiction.  For example, the Harbinger Investor Defendants invested in a company whose operations would be conducted almost exclusively in California; and their investments provided

Harbinger with the capital needed to develop products using Canoo's stolen intellectual property. The assertion of personal jurisdiction over the Harbinger Investor Defendants here will not offend traditional notions of fairness and substantial justice under Constitutional due process principles.

## GENERAL ALLEGATIONS

### A. Canoo is Formed as an EV Industry Disruptor.

33. Canoo was formed in 2017 by Stefan Krause and Ulrich Kranz as an EV industry disrupter to compete with the best the EV industry had to offer and the likes of Tesla. Since its formation, Canoo has invested significant resources—including time, money, and employee capital—to develop its vast intellectual property associated with its EV technology that includes trade secret, patent, copyright, trade dress, design, and its contractual programs. The Former Canoo Employees—who now work for Harbinger—were pivotal in developing and expanding Canoo's intellectual property.

34. At the heart of Canoo's business is its proprietary and highly differentiated platform—called the "skateboard"—that forms the core of Canoo's products. Canoo's skateboard is pictured below. Its architecture and design incorporate Canoo's intellectual property portfolio—including a combination of patents, trade secrets, trade dress, designs, and confidential information developed over the course of years at great cost to Canoo and its investors.



35. Through years of technological development, experimentation,

refinement, and know-how, Canoo developed one of the flattest EV driving platforms ever produced, and the first driving platform with a fully functioning rolling chassis—making it fully drivable without a cabin.  Canoo's skateboard provides a highly modular design that allows for a uniquely independent "drive by wire" experience.

36.     Canoo's prized trade secrets consist of its independent driving platform, skateboard architecture, and design Skateboard Technology.  The Skateboard Technology is highly adaptable and can be leveraged for a variety of purposes.  Based on the Skateboard Technology, Canoo has secured contracts with both NASA (to provide crewed transportation vehicles for Artemis lunar exploration launches) and with the United States Army (to provide tactical vehicles).  The capabilities and vulnerabilities of Canoo's Skateboard Technology could thus prove beneficial to adversaries of the United States Government.

37.     Canoo's Skateboard Technology is uniquely well-suited for step-van delivery vehicles, where separate chassis remain in use for nearly all iterations of delivery vans.  As such, Canoo invested heavily in developing business plans centered around the Skateboard Technology, which included exploring joint venture opportunities with third-party OEMs who could implement Canoo's driving platform into their pre-existing fleet of vehicles (i.e., the Skateboard Business Plan).  Because Canoo's Skateboard Technology could help OEMs expedite the conversion of its gas-powered fleets to electric at minimal cost to the manufacturers, these joint venture opportunities became pivotal to Canoo's long-term success in the crowded EV market.

38.     To that end, on or about August 24, 2020, Canoo entered a Mutual Non-Disclosure Agreement ("MNDA") with MO.  The MO relationship represented an important opportunity for Canoo to expand its growing business.  If Canoo could form a successful partnership with MO, Canoo could expand its Skateboard Business Plan to other OEMs.

39.     In connection with such discussions, MO revealed to Canoo what it was looking for, including vehicle specifications, intentions, timelines, pricing information, and the structure of the desired relationship.  Canoo and MO (and its parent corporation, Poindexter JB & Co, Inc.) worked together to explore the potential partnership for over a year and a half (the "MO Program").

40.     In September through December 2020, and in conjunction with Canoo's exploration of the Skateboard Business Plan, Canoo spent tens of millions of dollars to engage a world-leading business consulting firm to analyze EV markets, business opportunities, market penetration strategies, customer interests, competitors, market demand, and a general assessment of Canoo's relative competitiveness in the EV space, and its Skateboard Business Plan particularly.

41.     According to this comprehensive analysis, selling Canoo's skateboard to OEMs (like MO) was potentially highly profitable.  Canoo therefore moved forward and pursued the MO partnership.

**B.     Canoo's Success Depends on Protecting Its Trade Secrets.**

42.     Canoo's cutting-edge Skateboard Technology attracted top industry engineers and investors.  To develop and perfect its technology, Canoo spent a significant amount of time and money to build a team of talented employees qualified to develop and market Canoo's technology.

43.     Canoo's success is based, in large part, on its institutional knowledge of the EV market, its human capital, intangible assets, and its business operations.  As such, Canoo carefully protects its confidential, proprietary, and trade secret (and negative trade secret) information, which would have tremendous value to its competitors and foreign governments.  Canoo has taken reasonable steps to maintain the secrecy of its confidential and proprietary information and to ensure that its employees understand and comply with company policies to keep confidential and proprietary information, including its trade secret information, secret.

44.     Canoo's offices have physical and electronic security systems such as

gates, fencing, keycard-access and keypad-locked doors, electronic surveillance and cameras, and security personnel. Electronic access to its computer network is restricted and electronic access to its datafiles and databases is limited to a "need to know" basis. All Canoo computer systems, servers, and networks require that each user have a unique password, and all remote and VPN access require dual-factor authentication. All employees and independent contractors who receive access to confidential information are required to sign confidentiality and/or non-disclosure agreements.

45.   Moreover, Canoo requires its employees to execute a Confidential Information and Inventions Assignment Agreement ("Confidentiality Agreement") as a condition of employment. The Confidentiality Agreement (i) prohibits, among other things, the unauthorized disclosure and use of Canoo's confidential information (as defined therein) and (ii) bars the employees from discussing, disclosing, or using Canoo's trade secrets and confidential and proprietary information inappropriately.

46.   The Confidentiality Agreement also includes the following invention assignment provision whereby the employees agree to assign to Canoo all inventions created and/or developed by the employee while employed at Canoo:

> I hereby assign to Company all my right, title, and interest in and to any and all Inventions (and all Intellectual Property Rights with respect thereto) made, conceived, reduced to practice, or learned by me, either alone or with others, during the period of my employment by Company.

47.   Strict adherence to the Confidentiality Agreement is critical to Canoo's operations, as Canoo's current and former employees have developed and/or contributed to Canoo's trade secrets and confidential information and have expanded the scope and content of Canoo's intellectual property portfolio.

48.   Upon departure from Canoo, Canoo requires each employee to execute an Employee Separation Information Letter ("Separation Agreement"). The Separation Agreement: (i) strictly prohibits the employees from emailing any Canoo

documents or information to a personal email account and requires the immediate deletion of any such document or emails with written confirmation to Canoo of such deletion; (ii) requires the employees to return of all Canoo equipment and documents in the possession of the departing employee; and (iii) expressly requires the employees "to observe and abide by the terms of the Confidentiality Agreement," which includes the inventions assignment provision.

## C. Weicker and Charbonneau Join Canoo Shortly After Its Formation, Followed By Eberts.

49.     Before joining Canoo, Weicker, Eberts, and Charbonneau worked together with Harris at Faraday in Los Angeles where they conspired and schemed to own and control their own EV company one way or another.

50.     Canoo believes it was at Faraday where Harris, Weicker, Eberts, and Charbonneau honed their trade craft of stealing intellectual property for personal financial gain.  In lieu of starting an EV company using their own independent work, the four decided that it would be far more expeditious and inexpensive to do so by stealing privileged information and intellectual property while learning what works and doesn't work—all at the employer's expense.  Such an unfair competitive advantage would prove (and indeed, did prove) attractive.

51.     In or around December 2017, Weicker joined Canoo as the lead development manager/engineer "in charge of" Canoo's powertrain and electronics system.[8]

52.     Weicker's duties and responsibilities at Canoo included leading the clean-sheet development[9] of Canoo's electric drive system, battery system, power

---

[8] At Canoo the employee "in charge" (like Weicker, Charbonneau, and Eberts) typically exercise the highest level of authority beneath Canoo's executive team.

[9] Clean-sheets analyze a product's cost structure to help manufacturers optimize design and capture savings.

electronics, and electrical architecture.  Weicker was also the lead inventor of Canoo's structural battery approach.  He supervised and managed hundreds of employees, exercised control over hiring and firing employees, and established objectives and initiatives at Canoo.

53.    In or around December 2017, Charbonneau joined Canoo as a "Founder" and head engineer "in charge of" skateboards and cabin, reporting directly to Canoo's Chief Technology Officer.

54.    Charbonneau had authority to control budgets, exercised control over hiring and firing decisions, and established objectives and initiatives.  He supervised numerous employees.

55.    In or around September of 2018, Eberts joined Canoo and was "in charge of" Battery & Powertrain Development, reporting directly to Weicker with the same responsibilities as Charbonneau, including controlling budgets, exercising control over hiring and firing decisions, and establishing objectives and initiatives. He supervised numerous employees.

56.    Through their leadership positions with Canoo, Eberts, Weicker, and Charbonneau had access to Canoo's considerable financial resources, business plans, human capital, trade secrets, and other intellectual property.  For that reason, Canoo required Weicker, Eberts, and Charbonneau (like all Canoo employees) to sign a Confidentiality Agreement.

57.    Plaintiff is informed and believes, and on that basis alleges, that neither Eberts nor Weicker nor Charbonneau intended to comply with the terms of their Confidentiality Agreement, but instead sought access to Canoo's trade secrets and confidential information, which Eberts, Weicker, and Charbonneau used to ultimately start and control their own competing EV company.

**D.    Harris, Eberts, Weicker, and Charbonneau Conspire to Form Harbinger and Misappropriate Canoo's Trade Secrets and Confidential Information.**

58.    Harris, Eberts, Weicker, and Charbonneau always intended to own and

control their own EV company.  When Weicker and Charbonneau helped form Canoo in 2017, where Eberts later joined in 2018, it was only a stopping point, not the final destination.

59.   When Weicker, Charbonneau, and Eberts executed the Confidentiality Agreement and Separation Agreement, they never had any intention of complying with their terms.  To the contrary, they intended on using Canoo's intellectual property, business plan, and human capital to form their own competing company (and attract investors by having the information ready for use).

60.   In July 2019, Eberts left Canoo.  By that time, Eberts, Charbonneau, and Weicker had gained access to Canoo's trade secrets related to its Skateboard Technology. Canoo is informed and believes, and on that basis alleges, that when Eberts left Canoo he took with him trade secrets and intellectual property used in and related to Canoo's Skateboard Technology.

61.   With Eberts gone, Weicker and Charbonneau remained at Canoo together for another seventeen (17) months to work as "moles" so that they could continue to obtain Canoo's going forward trade secrets and confidential information, relaying the information to Eberts and Harris as they continued to craft Harbinger's foundation.

62.   The two moles embedded themselves in Canoo, taking on any task that would give them broad access to (and directional control of) Canoo's intellectual property portfolio and various lines of business.  Under the guise of employment, Weicker and Charbonneau spent their days learning the names and jobs of key engineers, commodity purchasers, and business development professionals, as well as Canoo's suppliers, vendors, investors, and partners.

63.   Weicker and Charbonneau began working on Canoo's Skateboard Business Plan (Weicker almost exclusively), and eventually the MO Program.  The MO Program required modifications to Canoo's existing Skateboard Technology, and Canoo tasked Weicker and Charbonneau with managing those modifications.  As

part of their work on those programs, Weicker met with investors, created slide decks, and worked with other Canoo employees.  For the next five months, Weicker became intimately familiar with all aspects of the MO Program.  Weicker and Charbonneau shared this information with their co-conspirators, Harris and Eberts.[10]

64.    Ultimately, Canoo's Skateboard Business Plan—the multimillion-dollar business plan to develop modular independent driving platforms that could be sold to OEMs for use in after-market delivery vehicles—cemented Harbinger's direction.

65.    In December 2020, Weicker left Canoo, leaving Charbonneau as the lead mole and one of the primary co-conspirators continuing to steal Canoo's confidential information and trade secrets on Harbinger's behalf.

66.    Armed with the trade secrets related to Canoo's Skateboard Technology and valuable Skateboard Business Plan, Weicker, Eberts and Harris sold the idea of a "ready-made EV" company to early investors, including Dusastre.

67.    The Harbinger Investor Defendants were well aware that Harbinger's business plan to develop modular independent driving platforms that could be sold to OEMs for use in after-market delivery vehicles (i.e., the Skateboard Business Plan and MO Program) was taken from Canoo through improper acts of corporate espionage.[11]   It is inconceivable that a start-up company like Harbinger could

---

[10] Throughout his tenure at Canoo, Weicker continuously and systematically stole Canoo's confidential information and trade secrets by forwarding emails to his personal email account as well as copying, downloading, and/or uploading Canoo's confidential documents, including portable units.  Weicker then shared such information with Harbinger, Harris, and Eberts.  Additionally, Plaintiff is informed and believes, and on that basis alleges, that while Weicker was at Canoo, he and Charbonneau conspired to and did intentionally sabotaged Canoo's relationship with MO to allow Harbinger the opportunity to form such an advantageous partnership.

[11] For example, Canoo explored a partnership (and even signed a non-disclosure agreement) with Kalyani Transmission Technology, an affiliate of Bharat Forge. **Bharat Forge is one of Harbinger's investors** who recently announced a partnership with Harbinger.  Bharat Forge therefore knew, or had reason to know, that Harbinger had at minimum misappropriated the Skateboard Business Plan and, in particular, Canoo's supplier lists.

1   independently develop such intricate technology in such a short period.

2       68.    The Harbinger Investor Defendants also knew of Harbinger's plan to

3   poach Canoo employees like Charbonneau, Fielkow, Patel and so many others.  This

4   made the investment even more attractive.  They were able to bypass the time and

5   substantial expense associated with the development of an EV business.

6   **E.**    **<u>Harbinger Launches.</u>**

7       69.    Plaintiff is informed and believed, and on that basis alleges, that

8   Weicker, Eberts, and Harris started the company that was to become Harbinger in

9   mid-2019 at the latest.  And, once Weicker, Charbonneau, Eberts, and Harris had

10  stolen enough of Canoo's intellectual property to safely move forward with product

11  development (and raise capital), they registered the company as "Electron Transport,

12  Inc." ("Electron") with the Delaware Secretary of State in or about February 2021.

13      70.    Subsequently, Electron changed its name to Harbinger.

14      71.    According to Harbinger's website, Harbinger created:

16  [D]river-focused chassis architecture designed to improve safety, driver
    experience, and productivity.  **The vehicles will feature autonomous-**
17  **ready drive-by-wire steering and enhancements to vehicle**
18  **ergonomics, including a best-in-class floor height below 28 inches,**
    **and a novel front suspension that reduces vehicle overhang**.

20      72.    Several of these specifications were copied from Canoo's Skateboard

21  Technology.  They were essential to the Skateboard Business Plan and the MO

22  Program.  And by this time, Charbonneau had spent two of his three years at Canoo

23  as a key manager and designer of Canoo's Skateboard Technology.[12]  Charbonneau

24  had access to Canoo's design specifications, production needs, and other trade secrets

25  and confidential information.  Charbonneau's knowledge of Canoo's Skateboard

26  Technology was critical to the development and launch of Canoo's Skateboard

---

[12] Charbonneau is a lead inventor on several Canoo domestic and international patent filings.

Business Plan.

73.     Charbonneau remained as the lead mole at Canoo for more than fifteen months after Weicker's departure, allowing him to further misappropriate Canoo's intellectual property for Harbinger's benefit.  Charbonneau knew the importance of the Skateboard Business Plan to Canoo's long-term success, so (on information and belief) he took action to sabotage Canoo's Skateboard Technology and Skateboard Business Plan while continuing to provide competitive intelligence to Harbinger.

74.     To copy Canoo's Skateboard Technology and execute the Skateboard Business Plan stolen from Canoo, Eberts, Weicker, Charbonneau, and Harris knew that Harbinger would need talented engineers and employees deeply familiar with EV technology.  And they knew exactly where to look.  Using Canoo's confidential information and trade secrets related to Canoo's employees, Eberts, Weicker, Charbonneau, and Harris strategically recruited the following employees to work for Harbinger, bringing with them the vast amount of confidential information and trade secrets that they themselves stole from Canoo:

➢ **Patel**:  During his 27 months at Canoo, Patel was the Director of Commodity Purchasing with Canoo in charge of Canoo's supplier relationships, production needs, and purchasing information.  Patel's access to Canoo's purchasing needs and supplier relationships was critical to the profitability of Canoo's Skateboard Business Plan, and integral to Harbinger's scheme.  Recent evidence confirms Patel stole supplier lists from Canoo.  While at Canoo, Patel was directly involved in exploring a supplier relationship with Kalyani Transmission Technology,[13] which signed an MNDA with Canoo in July 2020.  Kalyani's presentation(s) to Canoo outlined its product development and engineering capabilities, processes, and lead times.  When Patel joined Harbinger in March 2022 and discovered Harbinger needed a manufacturing

---

[13] Kalyani Transmission Technology is a wholly-owned subsidiary of Bharat Forge, one of the Harbinger Investor Defendants.

partner for the drivetrain in its driving platform, Patel looked to his supplier list stolen from Canoo. In September 2022, only five months after Patel jointed Harbinger, Harbinger announced a joint venture with Kalyani Powertrain Limited, an affiliate of Kalyani Transmission Technology.

➢ **Fielkow**: Fielkow, a self-described "experienced business executive and corporate attorney," served as in-house counsel for Canoo for thirty-seven (37) months, initially as Deputy General Counsel and subsequently as Canoo's Vice President of Corporate Legal, Securities & Global Strategy. During this time Fielkow oversaw a broad spectrum of in-house corporate legal and business matters, including strategic transactions and investments, corporate governance, board advisory, product development, intellectual property and technology licensing, IP litigation, regulatory compliance, securities law, data privacy, and commercial contracts with suppliers and partners. Fielkow had intimate knowledge of Canoo's intellectual property portfolio and had established relationships with Canoo's outside counsel that prosecuted Canoo's patents and registered their trademarks. As an attorney, Canoo trusted Fielkow to provide advice and counsel free of fraud, theft, and divided loyalty. Unfortunately for Canoo, its trust in Fielkow was misplaced. Fielkow grossly abused his fiduciary position, stealing untold amounts of Canoo's intellectual property, and even misrepresenting on several occasions that he would not join a competitor. Fielkow knew (or should have known) of the devastating impacts often caused by an attorney violating his ethical and professional responsibilities—yet he intentionally casted them aside.[14]

---

[14] Fielkow was also a member of Canoo's business development team where he assisted in setting and developing plans for business and revenue growth, researching and planning new market initiatives, and meeting with business partners. In his role as both an attorney and business development manager, Fielkow had intimate knowledge related to all of Canoo's business strategies.

➢ **Steven Offutt**: During his nearly four (4) years at Canoo, Offutt was in charge of manufacturing, battery, powertrain, and general assembly.  During this time, Offutt gained detailed knowledge of Canoo's technology, partners, and business plans (including the MO Program).  This included a wealth of information regarding the manufacturing and assembly of skateboards, including, suppliers and service providers, assembly/sub-assembly, timing, shipping, and logistics.  He was also involved in developing and building a manufacturing facility able to build skateboards at scale for the MO Program.

75.     Charbonneau, Patel, Offutt, and Fielkow decided to remain at Canoo after being recruited by Harbinger to continue stealing Canoo's trade secrets and confidential information.

76.     Over the course of the next two years, Harbinger continued to solicit, hire, and encourage Canoo's employees to misappropriate Canoo's trade secrets and confidential information, including fourteen former employees who had patent applications (including unpublished applications) pending at the time of their departure from Canoo.

77.     In sum, Canoo is informed and believes, and on that basis alleges, that Weicker, Charbonneau, and Eberts (i) conspired to form Harbinger prior to departing Canoo; (ii) solicited other Canoo employees (while still employed by Canoo) to leave Canoo and join Harbinger; (iii) continuously and systematically shared Canoo's trade secrets and confidential information with Harbinger (both while still employed at Canoo and upon their departure); and/or (iv) incentivized other Canoo employees to proactively steal Canoo's trade secrets and confidential information.

78.     The table below includes a list of Canoo's employees that have left to join Harbinger ("Poached Employees"), including (i) the month they departed Canoo; (ii) the month they joined Harbinger; (iii) their position at Canoo upon departure; and (iv) their position at Harbinger.

| NAME | TITLE AT CANOO | DEPARTURE FROM CANOO | HARBINGER TITLE | STARTED AT HARBINGER |
|------|----------------|----------------------|-----------------|----------------------|
| William Eberts | Program Manager – Battery, Powertrain, & Power Electronics | July 2019 | Co-Founder and Chief Operating Officer | March 2021 |
| Phillip Weicker | In charge of Property and Electric | December 2020 | Co-Founder and Chief Technology Officer | March 2021 |
| Isaac Meadows | Electrical Engineer | July 2021 | Electric Vehicle Engineer, Systems | July 2021 |
| Kenneth Kawanishi | Power Electronics Packaging Engineer & Battery Engineer | August 2021 | Battery Mechanical Engineer | September 2021 |
| Jackson Diebel | Powertrain Engineer | September 2021 | Powertrain Engineer | September 2021 |
| Dheemanth Uppalapati | Systems Engineer | September 2021 | Senior Systems Engineer | September 2021 |
| Anna Scheibengraber | Test Engineer, Battery Systems | September 2021 | Battery Test Engineer | October 2021 |
| Adrian Alvarado | Senior Purchasing Manager | November 2021 | Senior Supply Chain Analyst | June 2022 |
| Samuel Jantzi | Powertrain Engineer | December 2021 | Powertrain Engineer | January 2022 |
| Aaron Youngblood | Lead EV Technician | December 2021 | Senior Engineering Tech | January 2022 |

| NAME | TITLE AT CANOO | DEPARTURE FROM CANOO | HARBINGER TITLE | STARTED AT HARBINGER |
|---|---|---|---|---|
| Alexi Charbonneau | In Charge of Skateboard & Cabin | December 2021 | Vice President of Structure and Chassis | January 2022 |
| Richard D. Walker IV | In charge of Controls | January 2022 | Senior Software Engineer, Controls | January 2022 |
| Cody Rhebergen | Thermal Engineer | February 2022 | Thermal Analysis Engineer | February 2022 |
| Daniel McCarron | In Charge Skateboard | February 2022 | Senior Chassis Engineer | February 2022 |
| Jue Wang | Chassis Control Engineer | February 2022 | Senior Chassis Controls Engineer | February 2022 |
| Steven Offutt | In Charge – General Assembly, Powertrain, and Battery Engineering | February 2022 | Director, Manufacturing | February 2022 |
| Seth Lewis | Powertrain Engineer | February 2022 | Thermal Analysis Engineer | March 2022 |
| Tae Won Park | CAE Engineer | February 2022 | Principle, CAE Engineer | February 2022 |
| Kunal Gupta | Chassis Design Engineer | March 2022 | Chassis Engineer, Suspension | March 2022 |
| Michael Fricke | Design Release Engineer – HV Battery | March 2022 | HV Battery Pack Mechanical Engineer | March 2022 |
| Michael Fielkow | Vice President – Corporate Legal, Securities & | March 2022 | General Counsel Security & Head of | March 2022 |

| NAME | TITLE AT CANOO | DEPARTURE FROM CANOO | HARBINGER TITLE | STARTED AT HARBINGER |
|---|---|---|---|---|
| | Global Strategy | | Corporate Development | |
| Jigar Patel | Commodity Director – Metals & Chassis | March 2022 | Director, Supply Chain | March 2022 |
| Pau Burgaya Julia | Senior Thermal Engineer | March 2022 | Senior Thermal Engineer | April 2022 |
| Deb Bourke | Director, Battery Systems | March 2022 | Director, Engineering Program Management | April 2022 |
| Garrett Allen | Powertrain Engineer, Lead Drive Unit DRE | April 2022 | Senior Powertrain Engineer | May 2022 |
| Anthony Washington | Engineering Technician, Senior Design Prototype Engineering Technician | May 2022 | Senior Engineering Tech | June 2022 |
| Mrudang Kadakia | Powertrain Test Engineer | May 2022 | System Test Engineer | July 2022 |
| Will Smith | Lead Controls Engineer, Thermal Management | June 2022 | Thermal Controls, Simulation and Testing | June 2022 |
| Oscar Arriola | Manufacturing Supervisor | July 2022 | Senior Operator | July 2022 |
| Brent Caldwell | Senior Interior | September 2022 | Manager, Systems Integration | October 2022 |

| NAME | TITLE AT CANOO | DEPARTURE FROM CANOO | HARBINGER TITLE | STARTED AT HARBINGER |
|---|---|---|---|---|
| | Systems Engineer | | | |
| James Dameron | Motor Design Engineer | November 2022 | Senior Motor Design Engineer | November 2022 |
| Zane Bodenbender | HV Systems Engineer | December 2022 | HV Systems Engineering Lead | December 2022 |

79.     To date, Harbinger has poached and hired at least 33 Canoo employees, making up more than 66% of Harbinger's workforce.

**F.     Harbinger Utilizes Canoo's Trade Secrets and Confidential Information.**

80.     Harbinger's surreptitious scheme began to unravel in March 2022 when Canoo mistakenly received an email from one of its outside law firms that included three patent applications. Those patent applications listed Harris, Eberts, and Weicker as the inventors.

81.     Harbinger had engaged Canoo's own outside patent counsel for patent work—privileged information that Fielkow (as Canoo's Deputy General Counsel) would have known.  It is particularly telling that Fielkow left Canoo for Harbinger on March 11, 2022, just six days before the patent applications were sent by mistake to Canoo.  Given that the patent application drafting process is generally several months long, the process (as to Harbinger's patents sent to Canoo) was ongoing through at least the latter months of Fielkow's tenure **at Canoo**.  Canoo's outside law firm's and Fielkow's ethical duties and obligations to Canoo were neither disclosed, discussed, nor waived by Canoo.

82.     Fielkow—by working for Harbinger while still employed at Canoo—flagrantly disregarded his ethical duty to his then-client (Canoo) to avoid conflicts of interest while promoting the misappropriation of his client's (Canoo's) trade secrets by its own current and former employees.  Even if Harbinger's patent applications

involved EV technology not identical to Canoo's Skateboard Technology (or more broadly Canoo's EV technology), the underlying technology was developed by Weicker and Eberts, who were previously employed by Canoo.  Thus, Harbinger's patent applications involved technology potentially derivable from Canoo's technology and possibly assignable to Canoo pursuant to the invention assignment provision in the Confidentiality Agreement.  Fielkow, an attorney, knew that.

83.    On September 14, 2022, an article titled "What the hell is Harbinger and Why are They Showing a Boring Delivery Van at the Detroit Auto Show?" appeared online in the Autopian, a startup website self-described as a "car-culture website run by obsessive car nerds."  The article discusses an auspicious blue delivery van on a sizeable plot of show floor marked Harbinger, stating:

> That blue van up there looks to be an off-the-rack Grumman MT45 step[-]van, also sold as a Freightliner MT45, or a Morgan Olson RouteStar, or some confusing combination of those names; it's a boring, useful delivery van, and I think that's the whole point.  You see, Harbinger is in the business of making electric delivery van chassis, and I think they're very smart to make them work with one of the most common van bodies available instead of succumbing to the temptation of making something sleek and cool and new looking that will get a lot of attention, but will be expensive and effectively unavailable.

84.    As captured in the article and using Harbinger's own words:

> Harbinger's scalable stripped chassis has been built to support all of the popular medium-duty body types available today, including commercial walk-in vans, recreational vehicles, box trucks, and others.  The front overhang is reduced by Harbinger's innovative independent front suspension, and the tight integration of battery, powertrain, and frame allows a best-in-class floor height.  Steer-by-wire and brake-by-wire systems offer greater flexibility for driver positioning and prepares fleets for future innovations in autonomy and advanced safety.

85.    The article concludes, "[t]his is exactly what the delivery market needs if it's going to move to electrification: something that works with equipment that's

already in place: loading docks, racks and other interior van organizing systems, has driver and operator familiarity, and so on."

86.    The information confirmed Canoo's suspicions.  Harbinger had copied Canoo's Skateboard Business Plan and its Skateboard Technology, and rather than assign the associated intellectual property to Canoo as required, Eberts, Weicker, Charbonneau stole it for Harbinger to use.

87.    The article further confirms that Harbinger's entire technology and business model was stolen from Canoo's Skateboard Business Plan involving its MO Program.  More egregiously, **Harbinger's first partner was MO**.  Undoubtedly, Weicker, Charbonneau and Fielkow used confidential information discovered through their involvement with the Canoo-MO negotiations (over the course of a year and a half) to solidify the Harbinger-MO venture.

88.    Additionally, Plaintiff is informed and believes, and on that basis alleges, that while Weicker, Charbonneau and Fielkow were at Canoo, they conspired to and intentionally sabotaged Canoo's Skateboard Technology and its relationship with MO to allow Harbinger both the time and opportunity to form such an advantageous partnership.

89.    Indeed, Harbinger stole Canoo's valuable trade secrets, confidential information, Skateboard Technology, Skateboard Business Plan, strategic partnership, investor and vendor opportunities, and employees, and leveraged the same into a successful business model.  Defendants' calculated and systematic misconduct, theft of trade secrets and confidential information, and acts of corporate espionage is the pillar of Harbinger's success, while costing Canoo hundreds of millions of dollars.

### FIRST CAUSE OF ACTION
#### Misappropriation Of Trade Secrets in Violation
#### Of The Defend Trade Secrets Act, 18 U.S.C. § 1836, et seq.
#### (Against All Defendants)

90.    Canoo incorporates and realleges the allegations set forth above as if

1   fully set forth herein.

2       91.   Canoo enjoys an advantage over its competitors because of Canoo's

3   trade secrets, which include but are not limited to Canoo's Skateboard Technology,

4   intellectual property, consulting reports, programs or codes, suppliers and

5   manufacturers, pitch decks, lists of current and prospective customers and vendors

6   (such as MO), and lists of employees, whether such trade secrets are tangible or

7   intangible, and whether or however they are stored, compiled, or memorialized

8   physically, electronically, graphically, and/or photographically.

9       92.   Canoo's key trade secret, its Skateboard Technology, consists of its

10  highly differentiated skateboard platform, the architecture and design of which

11  incorporates Canoo's intellectual property portfolio—including a combination of

12  patents, trade secrets, trade dress, and confidential information developed over the

13  course of years at great cost to Canoo and its investors.   Canoo developed its

14  Skateboard   Technology   through   years   of   technological   development,

15  experimentation, refinement, and know-how, resulting in the first driving platform

16  with a fully functioning rolling chassis.   Canoo's skateboard provides a highly

17  modular design that allows for a uniquely independent "drive by wire" experience.

18      93.   Canoo's trade secret information also includes the Skateboard Business

19  Plan.   Canoo's Skateboard Business Plan is based on and includes Canoo's

20  confidential information about (i) Canoo's technology; (ii) third-party business needs

21  (including MO); (iii) market penetration; (iv) supplier and manufacturer costs and

22  timelines; (v) the architecture of proposed deals, including potential partners; and (vi)

23  employing a competitive business plan to provide the business intelligence necessary

24  to confirm the profitability of selling skateboards to OEMs.

25      94.   Canoo's many other trade secrets include but are not limited to:

26          a.   Lists and information about investors and potential investors.

27          b.   Pitch decks and other confidential internal communications about

28              market strategies and market development.

c.    Lists and information concerning Canoo's current and prospective customers and vendors and similar compilations.

d.    Methodologies, strategies, programs, and systems used by Canoo in managing assets, liabilities, and risk and/or in soliciting, marketing, selling, and providing products and services to its customers.

e.    Financial and accounting information of Canoo such as cost, pricing information, price lists, financial policies and procedures, revenues, and profit margins, targets, and forecasts.

f.    Information concerning Canoo's consultants, independent contractors, strategic partners, and lists of the foregoing.

g.    Information regarding employees including but not limited to their skills, evaluations, duties, and responsibilities.

h.    Information and identity about Canoo's employees.

i.    Negative trade secrets, i.e., Canoo's secret know-how about what does *not* work related to its skateboard platform.

95.    Additionally, information received from third parties (such as MO) under contractual confidentiality obligations is also considered a trade secret because it has independent value and derives a financial benefit to Canoo while depriving competitors like Harbinger of Canoo's strategies, relationships, and resources.

96.    Canoo's trade secrets are valuable and derive independent economic value because they are not generally known or readily accessible through proper means to others who can profit from use of the trade secrets.  Generally, this information has allowed Canoo to redefine its business processes and better position its products (i.e., the skateboard) to target a particular market segment (like OEMs).

97.    Canoo's actual and potential customer list provides Canoo with a substantial business advantage because its disclosure would allow a competitor—like Harbinger—to direct sales efforts to those customers, enabling them to solicit

business selectively and effectively.

98.    Canoo's financial information data provides Canoo with a substantial business advantage because it provides actionable insight into product performance, helps Canoo refine its business strategies, and improves organizational decision-making.

99.    Canoo's employee information has potential economic value because Canoo incurred great expense to compile this data and the underlying information would enable a competitor—like Harbinger—to recruit away Canoo's employees.

100.   As discussed above, Canoo has taken more than adequate measures to maintain the secrecy of this information.

101.   Accordingly, the above-described information constitutes "trade secrets" under the Defend Trade Secrets Act, 18 U.S.C. § 1836.

102.   Defendants were and are under a duty both to keep Canoo's proprietary and confidential information secret, and not to use or disclose such information other than for the benefit of Canoo and with Canoo's authorization.

103.   Defendants disclosed Canoo's confidential, proprietary, and trade secret information to other persons, and used that information in connection with their own competing business activities, as opposed to the interest of Canoo, all without Canoo's consent.

104.   Defendants obtained the proprietary and confidential information described above directly or indirectly from Canoo and not from generally available information and/or from Defendants' own independent research and efforts.

105.   Defendants' foregoing conduct constitutes an actual and threatened misappropriation and misuse of Canoo's trade secret information in violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836.

106.   Defendants' actions with respect to Canoo's trade secrets, as alleged above, were a deliberate scheme and plan to deprive Canoo of the benefits of Canoo's own substantial investment and to steal the economic benefit of years of Canoo's

labor.

107.   As a direct and proximate cause of Defendants' actions as alleged above, Canoo has suffered, and will continue to suffer, actual damages, including, but not limited to, loss of capital, loss of valuable business, loss of profits and future profits, and loss of goodwill, in an amount to be proven at trial.

108.   As a further proximate result of the misappropriation, Plaintiff is informed and believes, and on that basis alleges, that the Defendants have been unjustly enriched as a result of the misappropriation of Canoo's trade secrets. The amount of this unjust enrichment cannot presently be ascertained.

109.   Canoo has suffered irreparable harm as a result of Defendants' activities and will continue to suffer irreparable injury that cannot be adequately remedied at law unless Defendants, including their agents and all other persons acting in concert with them, are enjoined from engaging in any further such acts. The substantial harm to Canoo outweighs the public benefit of Defendants' conduct.

110.   Canoo is informed and believes, and on that basis alleges, that the conduct of Defendants was, and is, malicious, fraudulent, deliberate, and willful, as demonstrated by their conduct described above.   Canoo is therefore entitled to recover from Defendants exemplary damages as permitted by 18 U.S.C. § 1836(b)(3)(C).

111.   Canoo is also entitled to an award of attorneys' fees pursuant to 18 U.S.C. § 1836(b)(3)(D).

## SECOND CAUSE OF ACTION
### Misappropriation Of Trade Secrets in Violation of the California Uniform Trade Secrets Act, Cal. Civ. Code. § 3426.1
### (Against All Defendants)

112.   Canoo incorporates and realleges the allegations set forth above as if fully set forth herein.

113.   Canoo enjoys an advantage over its competitors because of Canoo's trade secrets as defined above in paragraphs 91-95, whether such trade secrets are

tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically.

114.   As described above, Canoo's trade secrets are valuable and derive independent economic value because they are not generally known or readily accessible through proper means to others who can profit from use of the trade secrets.

115.   As discussed above, Canoo has taken more than adequate measures to maintain the secrecy of this information.

116.   Canoo's trade secrets therefore constitute trade secrets under the California Uniform Trade Secrets Act (California Civil Code § 3426 *et seq.*).

117.   Defendants were and are under a duty both to keep Canoo's proprietary and confidential information secret, and to not use or disclose such information other than for the benefit of Canoo and with Canoo's authorization.

118.   Defendants disclosed Canoo's confidential, proprietary, and trade secret information to other persons, and used that information in connection with their own competing business activities, as opposed to the interest of Canoo, all without Canoo's consent.

119.   Defendants (either directly or indirectly) acquired Canoo's trade secret information described above.

120.   Defendants' actions with respect to Canoo's trade secrets, as alleged hereinabove, were a deliberate scheme to deprive Canoo of the benefits of Canoo's own substantial investment and to steal the economic benefit of its labor.

121.   As a direct and proximate cause of Defendants' actions as alleged above, Canoo has suffered, and will continue to suffer, actual damages, including, but not limited to, loss of capital, loss of valuable business, loss of profits and future profits, and loss of goodwill, in an amount to be proven at trial.

122.   As a further proximate result of the misappropriation, Plaintiff is informed and believes, and on that basis alleges, that the Defendants have been

unjustly enriched as a result of the misappropriation of Canoo's trade secrets. The amount of this unjust enrichment cannot presently be ascertained.

123.   Canoo has suffered irreparable harm as a result of Defendants' activities and will continue to suffer irreparable injury that cannot be adequately remedied at law unless Defendants, and their agents, and all other persons acting in concert with them, are enjoined from engaging in any further such acts. The substantial harm to Canoo outweighs the public benefit of Defendants' conduct.

124.   Plaintiff is informed and believed, and on that basis alleges, that the conduct of Defendants was and is, malicious, fraudulent, deliberate, and willful, as revealed by their conduct described above. Canoo is therefore entitled to recover from Defendants exemplary damages as permitted by California Civil Code § 3426.3.

125.   Canoo is also entitled to an award of attorneys' fees pursuant to California Civil Code §3426.4.

### THIRD CAUSE OF ACTION
#### Breach of Contract -- Confidentiality Agreement
#### (Against Eberts, Weicker, Fielkow, and Charbonneau)

126.   Canoo incorporates and realleges the allegations set forth above as if fully set forth herein.

127.   In addition to the above-described trade secrets, Canoo maintains other confidential information that (i) has value to Canoo in being kept confidential; and (ii) Canoo has legal and/or contractual obligations to maintain as confidential (such information is referred to herein as "Confidential Information").

128.   As set forth above, each of the Former Canoo Employees executed the Confidentiality Agreement.

129.   Based on the unambiguous terms of the Confidentiality Agreement, each of the Former Canoo Employees agreed that Canoo's trade secrets, intellectual property, and confidential information were Canoo's sole property and agreed to not use or disclose such information without Canoo's express written consent.

130.   Moreover, pursuant to the terms of the Confidentiality Agreement, the

Former Canoo Employees were prohibited from disclosing or using Canoo's Confidential Information without Canoo's consent.

131.   The Confidentiality Agreement further required the Former Canoo Employees to assign to Canoo, all inventions invented while employed at Canoo.

132.   The Confidentiality Agreement constitutes an enforceable contract between each of the Former Canoo Employees and Canoo.  As with every contract, the Confidentiality Agreement contains an implied covenant of good faith and fair dealing that requires the Former Canoo Employees to refrain from doing anything that would injure Canoo's right to receive the benefits of the Confidentiality Agreement.

133.   Canoo has performed all of its covenants and/or conditions under the Confidentiality Agreement, except to the extent that such performance has been prevented, excused, hindered, or waived by the Former Canoo Employees.

134.   The Former Canoo Employees' obligations under the Confidentiality Agreement are valid, enforceable, and binding upon each of them.

135.   The Former Canoo Employees materially breached the Confidentiality Agreement based on their conduct described herein by, among other things, (i) taking, disclosing, transferring, removing, misusing, and/or misappropriating Canoo's trade secrets and Confidential Information; (ii) accepting employment with Harbinger with the purpose or intent of disclosing Canoo's trade secrets and Confidential Information; and/or (iii) soliciting, recruiting, or inducing Canoo's employees to leave Canoo and join Harbinger for the purpose of further acquiring Canoo's intellectual property.

136.   In addition, the Former Canoo Employees, including Weicker, Eberts, and Charbonneau, failed to assign to Canoo, all inventions (and associated intellectual property) that they developed and/or invented while employed at Canoo. Their failure to do so constitutes a separate, material breach of the Confidentiality Agreement.

137.   Indeed, Harbinger's entire product platform is based on Canoo's Confidential Information, Skateboard Technology, and developments made by Eberts and Weicker that should have been assigned to Canoo pursuant to the Confidentiality Agreement.

138.   As a direct and proximate result of the Former Canoo Employees' material breaches of the Confidentiality Agreement, Canoo has sustained general, special, consequential, and incidental damages in an amount to be proven at trial.

139.   Moreover, pursuant to the specific terms of the Confidentiality Agreement, Canoo is entitled to a Court order, directing Harbinger to assign all of its intellectual property, including its skateboard technology that was developed by Eberts and Weicker (while employed at Canoo) yet was not assigned to Canoo as required by the Confidentiality Agreement.

### FOURTH CAUSE OF ACTION
### Breach of Contract -- Separation Agreement
### (Against Eberts, Weicker, Fielkow, and Charbonneau)

140.   Canoo incorporates and realleges the allegations set forth above as if fully set forth herein.

141.   As described above, each of the Former Canoo Employees and Canoo entered into the Separation Agreement.

142.   Pursuant to the Separation Agreement, the Former Canoo Employees agreed to (i) not disclose Canoo's Confidential Information, (ii) to not email any Canoo documents or information to a personal email address, and (iii) return all of Canoo's equipment in their possession to Canoo prior to their departure.

143.   The Separation Agreement specifically states:

[Y]ou have certain post-employment obligations which you are required to uphold with respect to Canoo's confidential information and intellectual property, which are outlined below and also fully set forth in the Employee Confidential Information and Inventions Assignment Agreement that you signed during your employment ("***CIIA***"). "Confidential Information" is fully defined in the CIIA but includes, without limitation, product information and specifications, supplier

information, contract terms, methods of operation, sales and marketing plans and investor and financial information.  Under applicable law and under the terms of the CIIA, you are obligated to keep all such information confidential and to not use it to the detriment of the Company.  In particular, you may not use it for, or disclose it to, any third party, including any new employer or competitor of the Company.  This duty with respect to Confidential Information extends for two (2) years following your separation (other than with respect to trade secrets, which remain subject to restriction indefinitely by law).

144.   The Separation Agreement constitutes an enforceable contract between each of the Former Canoo Employees and Canoo.  As with every contract, the Separation Agreement contains an implied covenant of good faith and fair dealing that requires the Former Canoo Employees to refrain from doing anything that would injure Canoo's right to receive the benefits of the Separation Agreement.

145.   Canoo has performed all of its covenants and/or conditions in the Separation Agreement, except to the extent that such performance has been prevented, excused, hindered, or waived by the Former Canoo Employees.

146.   The Former Canoo Employees' obligations under the Separation Agreement are valid, enforceable, and binding upon each of them.

147.   Each of the Former Canoo Employees materially breached the Separation Agreement based on the conduct described above by, among other things, (i) taking, disclosing, transferring, removing, misusing, and/or misappropriating Canoo's trade secrets and Confidential Information; (ii) accepting employment with Harbinger with the purpose or intent of disclosing Canoo's trade secrets and Confidential Information.

148.   In addition, Weicker, Eberts, and Charbonneau failed to assign to Canoo, all inventions (and associated intellectual property) that they developed and/or invented while employed at Canoo.  Their failure to do so constitutes a separate, material breach of the Separation Agreement.

149.   Indeed, Harbinger's entire product platform is based on Canoo's Confidential Information, Skateboard Technology, and developments made by

Eberts, Weicker, and Charbonneau that should have been assigned to Canoo pursuant to the Separation Agreement.

150.   As a direct and proximate result of the Former Canoo Employees' material breaches of the Separation Agreement, Canoo has sustained general, special, consequential, and incidental damages in an amount to be proven at trial.

151.   Moreover, pursuant to the terms of the Separation Agreement, Canoo is entitled to a Court order, directing Harbinger to assign all of its intellectual property, including its skateboard technology which was developed by Eberts and Weicker yet was not assigned to Canoo as required by the Separation Agreement.

152.   Canoo also seeks an award of attorneys' fees pursuant to the terms of the Separation Agreement.

## FIFTH CAUSE OF ACTION
### Intentional Interference with Contractual Relations
### (Against Harbinger and Electron)

153.   Canoo incorporates and realleges the allegations set forth above as if fully set forth herein.

154.   As set forth above, each of the Poached Employees (including the Former Canoo Employees) and Canoo entered into the Confidentiality Agreement and the Separation Agreement.

155.   Harbinger knew that the Poached Employees had contracts with Canoo, as Weicker, Eberts, and Charbonneau themselves signed such agreements with Canoo and such agreements were required of all Canoo employees.

156.   Nonetheless, Harbinger entered into an employment agreement with the Poached Employees, requiring them and/or expecting them to disclose Canoo's trade secrets and Confidential Information.

157.   Harbinger encouraged the Poached Employees to disclose Canoo's trade secrets and Confidential Information and refuse to assign to Canoo, all inventions invented while employed at Canoo, fully aware that these individuals were

contractually barred from doing so under the Confidentiality Agreement and the Separation Agreement.

158. Harbinger's conduct prevented (and continues to prevent) the Poached Employees' performance under the Confidentiality Agreement and Separation Agreement.

159. Harbinger willfully and intentionally interfered with these agreements, without privilege to do so, by aiding, abetting, encouraging and/or assisting the Poached Employees in breaching their contractual obligations to Canoo to (i) immediately return all of Canoo's trade secrets and Confidential Information to Canoo upon departure from Canoo; (ii) return all of Canoo's property upon departure; and (iii) not use, disclose or misappropriate Canoo's trade secrets and Confidential Information.

160. In addition, Weicker, Eberts, and Charbonneau aided, abetted, and encouraged the Poached Employees to breach their contractual obligation to assign to Canoo, all inventions they created and/or developed while employed at Canoo.

161. Canoo is informed and believes, and on that basis alleges, that Harbinger intended to disrupt the performance of the Confidentiality Agreement and Separation Agreement, or knew that disruption of performance was certain, or substantially certain, to occur.

162. Canoo was harmed by Harbinger's conduct.

163. Harbinger's conduct was a substantial factor in causing Canoo's harm.

164. As a result of Harbinger's conduct, Canoo has sustained general, special, consequential, and incidental damages in an amount to be proven at trial.

165. Canoo is informed and believes, and on that basis alleges, that Harbinger acted with oppression, fraud, and malice, and with the intent to injure and damage Canoo, entitling Canoo to an award of punitive damages against Harbinger in an amount according to proof at trial and sufficient to punish and to deter Harbinger from engaging in this conduct in the future.

## SIXTH CAUSE OF ACTION
### Negligent Interference with Contractual Relations
### (Against Harbinger and Electron)

166.   Canoo incorporates and realleges the allegations set forth above as if fully set forth herein.

167.   As set forth above, the Poached Employees and Canoo entered into the Confidentiality Agreement and the Separation Agreement.

168.   Harbinger knew or should have known of the contracts between the Poached Employees and Canoo, as Weicker, Eberts, and Charbonneau themselves signed such agreements with Canoo.

169.   Nonetheless, Harbinger entered into an employment agreement with the Poached Employees, requiring them and/or expecting them to disclose Canoo's trade secrets and Confidential Information.

170.   Canoo is informed and believes, and on that basis alleges, that Harbinger failed to act with reasonable care.

171.   Harbinger encouraged the Poached Employees to disclose Canoo's trade secrets and Confidential Information and refuse to assign to Canoo, all inventions invented while employed at Canoo, well aware they were contractually barred from doing so under the Confidentiality Agreement and the Separation Agreement.

172.   Harbinger's conduct prevented (and continues to prevent) the Poached Employees' performance under the Confidentiality Agreement and Separation Agreement.

173.   Canoo is informed and believes, and on that basis alleges, that Harbinger breached its duty of care by disrupting the performance of the Confidentiality Agreement and Separation Agreement.

174.   Canoo was harmed by Harbinger's conduct.

175.   Harbinger's conduct was a substantial factor in causing Canoo's harm.

176.   As a result of Harbinger's conduct, Canoo has sustained general, special, consequential, and incidental damages in an amount to be proven at trial.

## SEVENTH CAUSE OF ACTION
### Intentional Interference with
### Prospective Economic Advantage
### (Against Harbinger and Electron)

177.   Canoo incorporates and realleges the allegations set forth above as if fully set forth herein.

178.   A business relationship existed between Canoo and other third parties, including MO.

179.   Based upon the significant financial capital and human resources exerted in developing the Skateboard Business Plan, including development of the MO Program, Canoo had a reasonable expectation of receiving the benefits of its relationship with MO for the implementation of its skateboard technology in MO's fleet of vehicles.

180.   There was a probability of future economic benefit to Canoo from the business relations between Canoo and MO.  If MO incorporated Canoo's technology as discussed above, then it would expedite the conversion of MO's existing gas-powered fleet to electric at minimal cost.  The MO Program would therefore have yielded a significant financial profit to Canoo.  Canoo invested millions of dollars in both evaluating its potential relationship with MO and determining the benefit and profitability of Canoo's OEM strategy.

181.   Harbinger knew of Canoo's Skateboard Business Plan and its relationship with MO, including the development of the MO Program, as Weicker was intimately familiar with virtually all aspects of the MO Program.

182.   Using information obtained from Weicker, Harbinger willfully and intentionally interfered with that relationship, without privilege to do so, by usurping Canoo's corporate opportunity with MO.

183.   Harbinger's conduct was willful.

184.   Harbinger acted in such manner to exclude Canoo from any revenues and profits derived from the transactions between Canoo and MO.

185.   Canoo is informed and believes, and on that basis alleges, that by engaging in this conduct, Harbinger intended to disrupt the relationship or knew that disruption of the relationship between Canoo and MO was certain or substantially certain to occur.

186.   There was an actual disruption in the relationship between Canoo and MO.

187.   As discussed hereinabove, Harbinger engaged in wrongful conduct.

188.   Canoo was substantially harmed by Harbinger's conduct.

189.   Harbinger's conduct was a substantial factor in causing Canoo's harm.

190.   As a direct and proximate result of Harbinger's conduct, Canoo suffered substantial damages, including special damages in the form of lost earnings, benefits and/or out of pocket expenses in an amount to be proven at trial.

191.   As a further direct and proximate result of Harbinger's conduct, Canoo will continue to suffer additional damages including special damages in the form of lost future earnings, benefits and/or other prospective damages in an amount according to proof at trial.

192.   Canoo is informed and believes, and on that basis alleges, that Harbinger acted with oppression, fraud, and malice, and with the intent to injure and damage Canoo, entitling Canoo to an award of punitive damages against Harbinger, in an amount according to proof at trial and sufficient to punish and to deter Harbinger from engaging in this conduct in the future.

## EIGHTH CAUSE OF ACTION
### Negligent Interference with Prospective Economic Advantage
### (Against Harbinger and Electron)

193.   Canoo incorporates and realleges the allegations set forth above as if fully set forth herein.

194.   A business relationship existed between Canoo and other third parties, including MO.

195.   Based upon the significant financial capital and human resources exerted in developing the Skateboard Business Plan, specifically the MO Program, Canoo had a viable expectation of receiving the benefits of its relationship with MO for the implementation of its skateboard technology in MO's electrified fleet of vehicles.

196.   There was a probability of future economic benefit to Canoo from the business relations between Canoo and MO.

197.   Harbinger knew of Canoo's Skateboard Business Plan and its relationship with MO, including the development of the MO Program.

198.   Harbinger failed to act with reasonable care.

199.   Canoo is informed and believes, and on that basis alleges, that by engaging in the conduct discussed hereinabove, Harbinger disrupted the relationship between Canoo and MO.

200.   There was an actual disruption in the relationship between Canoo and MO.

201.   Canoo was substantially harmed by Harbinger's conduct.

202.   As a proximate result of Harbinger's conduct, Canoo suffered substantial damages, including special damages, in the form of lost earnings, benefits and/or out of pocket expenses in an amount to be proven at trial.

203.   As a further direct and proximate result of the Harbinger's conduct, Canoo will continue to suffer additional damages including special damages in the form of lost future earnings, benefits and/or other prospective damages in an amount to be proven at trial.

## NINTH CAUSE OF ACTION
### Breach of Fiduciary Duty
### (Against Eberts, Weicker, Fielkow and Charbonneau)

204.   Canoo incorporates and realleges the allegations set forth above as if fully set forth herein.

205.   Eberts, Weicker, Fielkow, and Charbonneau were high-level executives at Canoo.  As such, they owed Canoo fiduciary duties, including, without limitation, duties of care and undivided loyalty.

206.   Canoo is informed and believes, and on that basis allege, that Eberts, Weicker, Fielkow, and Charbonneau breached their fiduciary duties to Canoo, and/or knowingly aided and abetted, substantially assisted, and encouraged each of the other Poached Employees, to breach their duties by engaging in the following acts and omissions, among others:

      a.    Competing with Canoo through the new entity they were forming, while still employed by Canoo;

      b.    Attempting to divert Canoo's business plan and strategic partnership with MO;

      c.    Improperly disclosing to a competitor, Canoo's trade secrets and Confidential Information;

      d.    Interfering with Canoo's relationships with its customers, potential partners and suppliers, and investors;

      e.    Soliciting employees to leave Canoo and join Harbinger for the purpose of acquiring Harbinger's intellectual property;

      f.    Interfering with the Canoo's relationships with its employees and third-party service providers through various solicitations;

      g.    Working and acting as officers for Harbinger, while still employed by Canoo; and,

      h.    Sabotaging and undermining Canoo's Skateboard Business Plan, specifically the MO Program.

207.   Fielkow (as counsel to Canoo) owed a non-waivable fiduciary duty to Canoo.  As described above, Fielkow breached both his fiduciary and ethical duties to Canoo by (i) disclosing to Harbinger, Canoo's intellectual property, including trade secret information and Confidential Information; (ii) misrepresenting to Canoo on

several occasions that he would not join a competitor; and (iii) disclosing to Harbinger while still employed at Canoo, Canoo's patent counsel.

208.   Canoo did not give informed consent to Eberts, Weicker, Fielkow, or Charbonneau to breach their fiduciary duties.

209.   Fielkow did not seek and Canoo did not waive any conflict of interest to Fielkow, as its former legal counsel.

210.   Canoo is informed and believes, and on that basis alleges, that as a direct, foreseeable, and proximate result of Eberts', Weicker's, Fielkow's, and Charbonneau's breaches of fiduciary duties described herein, Canoo has been damaged in an amount presently unknown, but to be proven at trial.

211.   Canoo is informed and believes and on that basis alleges, that Eberts, Weicker, Fielkow, and Charbonneau acted willfully, maliciously, oppressively and despicably with the full knowledge of the adverse effect of their actions and with willful and deliberate disregard of the consequences such as to constitute oppression, fraud or malice.   By reason thereof, Canoo is entitled to recover punitive and exemplary damages from Eberts, Weicker, Fielkow, and Charbonneau in an amount to be proven at trial and sufficient to punish or set an example of Eberts, Weicker, Fielkow and Charbonneau and to deter them from engaging in such conduct in the future.

### TENTH CAUSE OF ACTION
#### Aiding & Abetting Breach of Fiduciary Duty
#### (Against Harbinger, Harris and Dusastre)

212.   Canoo incorporates and realleges the allegations set forth above as if fully set forth herein.

213.   At all times alleged herein, Harbinger, Harris and Dusastre knew (or should have known) that Eberts, Weicker, Fielkow, and Charbonneau each owed fiduciary duties to Canoo.

214.   As discussed above, Weicker, Eberts, Fielkow and Charbonneau breached their fiduciary duties to Canoo.

215.   At all times alleged herein, Harbinger, Harris and Dusastre were aware of the conduct of Eberts, Weicker, Fielkow, and Charbonneau as alleged herein, including their breaches of their fiduciary duties owed to Canoo.

216.   Harbinger, Harris and Dusastre gave substantial assistance or encouragement to Weicker, Eberts, Fielkow, and Charbonneau to breach their fiduciary duties.

217.   Harbinger's, Harris', and Dusastre's conduct was a substantial factor in causing harm to Canoo.

218.   Canoo is informed and believes, and on that basis alleges, that as a direct, foreseeable, and proximate result of Harbinger's, Harris', and Dusastre's conduct, Canoo has been damaged in an amount presently unknown, but to be proven at trial.

219.   Canoo is informed and believes, and on that basis alleges, that Harbinger, Harris, and Dusastre acted willfully, maliciously, oppressively, and despicably with the full knowledge of the adverse effect of their actions and with willful and deliberate disregard of the consequences such as to constitute oppression, fraud or malice.   By reason thereof, Canoo is entitled to recover punitive and exemplary damages from Harbinger, Harris, and Dusastre in an amount to be proven at trial and sufficient to punish or set an example of Harbinger, Harris, and Dusastre and to deter them from engaging in such conduct in the future.

## ELEVENTH CAUSE OF ACTION
### Breach of Duty of Loyalty
### (Against Eberts, Weicker, Fielkow, and Charbonneau)

220.   Canoo incorporates and realleges the allegations set forth above as if fully set forth herein.

221.   As then-employees of Canoo, the Former Canoo Employees owed Canoo a duty of undivided loyalty to (i) place Canoo's interests above their own, (ii) refrain from competing with Canoo while employed by Canoo, and (iii) act for its benefit in matters connected with their contractual and employment relationship with

Canoo.   The Former Canoo Employees owed such duties by virtue of their employment relationship with Canoo and by the special confidence reposed in them by Canoo in connection with their exposure and access to Canoo's trade secrets and Confidential Information.

222.   In addition, at all times during their employment with Canoo the Former Canoo Employees owed to Canoo multiple statutory duties of care, including duties to: "use ordinary care and diligence" in the performance of their duties (Cal. Labor Code § 2854); "substantially comply with all the directions of" the Company (*id.* § 2856); "exercise a reasonable degree of skill" in the performance of their duties (*id.* § 2858); and "use such skill as [they] possess[], so far as the same is required" (*id.* § 2859).

223.   Each of the Former Canoo Employees directly breached their duty of loyalty owed to Canoo, and/or knowingly aided and abetted, substantially assisted and encouraged each of the other Poached Employees in breaching their duty of loyalty of care, by among other things engaging in the following conduct while employed by the Canoo:

a.   Competing with the Canoo;

b.   Disclosing Canoo's trade secrets and Confidential Information to Harbinger;

c.   Acting in such manner as to sabotage Canoo's operations;

d.   Interfering with and attempting to sabotage Canoo's relationships with investors, customers, and suppliers;

e.   Interfering with and sabotaging Canoo's relationship with potential partnership opportunities, such as with MO;

f.   Diverting Canoo's business plan to Harbinger;

g.   Soliciting employees to leave Canoo and join Harbinger for the purpose of acquiring Harbinger's intellectual property; and,

h.   Interfering with Canoo's relationships with its employees and third-

party service providers through various solicitations.

224.   The Former Canoo Employees' misconduct, as described above, breached multiple statutory and other duties of care that they owed Canoo, damaging Canoo.  Further, the Former Canoo Employees' actions and/or inactions constituted culpable misconduct, and the Former Canoo Employees are "liable to [Canoo] for the damage thereby caused," pursuant to California Labor Code Section 2865.

225.   Canoo did not give informed consent to the Former Canoo Employees' misconduct.

226.   Canoo is informed and believes, and on that basis alleges, that as a direct, foreseeable, and proximate result of the Former Canoo Employees' breach of the duties of loyalty and care described herein, Canoo has been damaged in an amount presently unknown, but to be proven at trial.

## TWELFTH CAUSE OF ACTION
### Aiding & Abetting Breach of Duty of Loyalty
### (Against Harbinger, Harris and Dusastre)

227.   Canoo incorporates and realleges the allegations set forth above as if fully set forth herein.

228.   At all times alleged herein, Harbinger, Harris, and Dusastre knew that each of the Former Canoo Employees owed Canoo a duty of loyalty.

229.   As discussed hereinabove, each of the Former Canoo Employees breached their duty of loyalty to Canoo.

230.   At all times alleged herein, Harbinger, Harris, and Dusastre were aware of the wrongful conduct of the Former Canoo Employees as alleged above, including their breach of the duty of loyalty.

231.   Harbinger, Harris, and Dusastre gave substantial assistance and/or encouragement to the Former Canoo Employees to breach their duty of loyalty.

232.   Harbinger's, Harris', and Dusastre's conduct caused Canoo harm.

233.   Harbinger's, Harris', and Dusastre's conduct was a substantial factor in causing harm to Canoo.

234.   Canoo is informed and believes, and on that basis alleges, that as a direct, foreseeable, and proximate result of Harbinger's, Harris', and Dusastre's conduct, Canoo has been damaged in an amount presently unknown, but to be proven at trial.

235.   Canoo is informed and believes, and on that basis alleges, Harbinger, Harris, and Dusastre acted with oppression, fraud, and malice, and with the intent to injure and damage Canoo, entitling Canoo to an award of punitive damages against Weicker and Eberts in an amount according to proof at trial and sufficient to punish and to deter Weicker and Eberts from engaging in this conduct in the future.

### THIRTEENTH CAUSE OF ACTION
**Fraud in the Inducement as to the Confidentiality Agreement**
**(Against Eberts, Weicker, Fielkow, and Charbonneau)**

236.   Canoo incorporates and realleges the allegations set forth above as if fully set forth herein.

237.   Eberts, Weicker, Fielkow, and Charbonneau engaged in wide-ranging corporate espionage.  From the outset, they joined Canoo knowing that they would later form their future EV company (Harbinger) where Harris would later join them. Eberts, Weicker, Charbonneau, and Fielkow  gained access to Canoo's trade secrets and Confidential Information to be used in forming Harbinger.

238.   In order to do so, Weicker, Eberts, Fielkow, and Charbonneau entered into the Confidentiality Agreement promising among other things that they would refrain from using, stealing, and/or disclosing Canoo's Confidential Information as defined therein, and that they would assign to Canoo, all inventions (and all intellectual property associated therewith) that they created and/or developed while employed at Canoo.

239.   Neither Weicker, nor Eberts, nor Fielkow, nor Charbonneau had any intention to comply with the terms of the Confidentiality Agreement when they entered into it, knowing that they would later form Harbinger using intellectual property stolen from Canoo.

240.   Weicker, Eberts, Fielkow, and Charbonneau joined Canoo to steal Canoo's trade secrets and Confidential Information and using the information for their own economic benefit, including to form Harbinger.  Harbinger (through Weicker, Eberts, Harris, Fielkow, and/or Charbonneau) solicited investments from foreign entities, including Bharat Forge, with knowledge that such foreign investors would enjoy access to the intellectual property (including trade secrets) stolen from Canoo.

241.   Canoo is informed and believes, and on that basis alleges, that Weicker, Eberts, Fielkow, and Charbonneau knew that the representations they made in the Confidentiality Agreement were false.

242.   Canoo is informed and believes, and on that basis alleges, that these material false statements were made with the intent to deceive and defraud Canoo.

243.   When they joined Canoo and entered into the Confidentiality Agreement, Weicker, Eberts, Fielkow, and Charbonneau intentionally concealed their plan to steal Canoo's trade secrets and Confidential Information for their own economic benefit.

244.   Canoo is informed and believes, and on that basis alleges, that Weicker, Eberts, Fielkow, and Charbonneau made these material misrepresentations and concealments with the intent to induce Canoo to take actions detrimental to Canoo's interests – to provide them with access to Canoo's trade secrets and Confidential Information.

245.   Canoo was ignorant of the true facts when Weicker, Eberts, Fielkow, and Charbonneau made the foregoing material misrepresentations and concealments in the Confidentiality Agreement.

246.   Canoo relied on Weicker's, Eberts's, Fielkow's, and Charbonneau's concealments, misrepresentations, and deception to its detriment, including by providing them with access to Canoo's trade secrets and Confidential Information, such as its Business Plans, strategies and development efforts.

247. Canoo's reliance was reasonable in light of Weicker's, Eberts', Fielkow's, and Charbonneau's stated intent to comply with the Confidentiality Agreement.

248. As a direct and proximate result of Weicker's, Eberts', Fielkow's, and Charbonneau's concealment, misrepresentations, improper conduct, and actual fraud alleged herein, Canoo has suffered damages in an amount to be proven at trial.

249. Canoo is informed and believes, and on that basis alleges, that Weicker, Eberts, Fielkow, and Charbonneau acted with oppression, fraud, and malice, and with the intent to injure and damage Canoo, entitling Canoo to an award of punitive damages against Weicker, Eberts, Fielkow, and Charbonneau in an amount according to proof at trial and sufficient to punish and to deter Weicker, Eberts, Fielkow, and Charbonneau from engaging in this conduct in the future.

## FOURTEENTH CAUSE OF ACTION
### Fraud in the Inducement as to the Separation Agreement
### (Against Eberts, Weicker, Fielkow, and Charbonneau)

250. Canoo incorporates and realleges the allegations set forth the above as if fully set forth herein.

251. As discussed herein, Harbinger and its officers, Weicker, Eberts, Harris and Dusastre conspired to form Harbinger using Canoo's trade secrets and Confidential Information including Canoo's own employees.

252. In connection with such scheme, when each of the Former Canoo Employee departed Canoo to join Harbinger, each of the Former Canoo Employees intended to (and did) take Canoo's trade secrets and Confidential Information.

253. Each of the Former Canoo Employees entered into the Separation Letter, promising among other things that they would refrain from disclosing Canoo's trade secrets and Confidential Information subsequent to their departure from Canoo and that they would return all documents and equipment to Canoo prior to departure.

254. The Former Canoo Employees, however, never intended to comply with these promises when they signed the Separation Letter. Rather, their plan was to

continue to use Canoo's trade secrets and Confidential Information for the benefit of Harbinger once they joined Harbinger.

255.   Canoo is informed and believes, and on that basis alleges, that the Former Canoo Employees knew that the representations they made in the Separation Agreement were false.

256.   Canoo is informed and believes, and on that basis alleges, that these material false statements were made with the intent to deceive and defraud Canoo.

257.   Each of the Former Canoo Employees intentionally concealed the fact that when they entered into the Separation Agreement, they intended to join Harbinger, and intended to share Canoo's trade secrets and Confidential Information.

258.   Canoo is informed and believes, and on that basis alleges, that the Former Canoo Employees made these material misrepresentations and concealments with the intent to induce Canoo to take actions detrimental to Canoo's interests.

259.   Canoo was ignorant of the true facts when the Former Canoo Employees made the foregoing material misrepresentations and concealments in the Separation Agreement.

260.   Canoo relied on the Former Canoo Employees' concealments misrepresentations and deception to its detriment.

261.   Canoo's reliance was in fact reasonable in light of the Former Canoo Employees' agreement to be bound by the Separation Agreement.

262.   As a direct and proximate result of the Former Canoo Employees' concealment, misrepresentations, improper conduct and actual fraud alleged herein, Canoo has suffered damages in an amount to be proven at trial.

263.   Canoo is informed and believes, and on that basis alleges, that the Former Canoo Employees acted with oppression, fraud, and malice, and with the intent to injure and damage Canoo, entitling Canoo to an award of punitive damages against the Former Canoo Employees in an amount according to proof at trial and sufficient punish and to deter the Former Canoo Employees from engaging in this

conduct in the future.

## FIFTEENTH CAUSE OF ACTION
### Unfair Competition [Cal. Business and Professions Code. § 17200 et seq.]
### (Against All Defendants)

264.   Canoo incorporates and realleges the allegations set forth above as if fully set forth herein.

265.   This is a cause of action for unfair business practices arising under California Business and Professions Code section 17200 et seq., which prohibits unfair competition.

266.   The statute prohibits "any unlawful, unfair or fraudulent business act or practice." *See* Cal. Bus. & Prof. Code §17200.

267.   As alleged above, Defendants engaged in unlawful, unfair and fraudulent business practices, including but not limited to Defendants' corporate espionage, fraud, improper disclosure of Canoo's Confidential Information, and intentionally sabotaging and undermining Canoo's operations, including its relationship with MO.

268.   Plaintiff is informed and believes, and on that basis alleges, that in violation of California Business and Professions Code section 17200 et seq., Defendants improperly misappropriated, removed, retained, and/or began using Canoo's Confidential Information.

269.   Defendants' actions are part of a deliberate scheme and plan to deprive Canoo of the benefits of its own substantial investment and efforts and to steal the fruits of several years of its labor, and to give Defendants an unfair competitive advantage.

270.   Defendants have been unjustly enriched and Canoo has suffered irreparable harm as a result of Defendants' activities and will continue to suffer irreparable injury that cannot be adequately remedied at law unless Defendants, including their agents and all other persons acting in concert with them, are enjoined

from engaging in any further such acts.

271.   The substantial harm to Canoo outweighs the public benefit of Defendants' conduct.

272.   Canoo is entitled to injunctive relief ordering Defendants to refrain from further violations of the California Business and Professions Code.

273.   Canoo is further entitled to restitution of monies wrongfully acquired by Defendants as well as all funds expended by Canoo as a result of Defendants' acts and practices of unfair competition.

## SIXTEENTH CAUSE OF ACTION
### Unjust Enrichment
### (Against Harbinger)

274.   Canoo incorporates and realleges the allegations set forth above as if fully set forth herein.

275.   As a result of the illegal and wrongful conduct alleged herein, Harbinger has been and will be unjustly enriched at the expense of Canoo.

276.   Harbinger is under an obligation to repay Canoo all monies and financial benefits it gained and by which Harbinger was unjustly enriched as a result of the wrongful conduct discussed herein.

277.   Canoo is informed and believes, and on that basis alleges, that Harbinger has been unjustly enriched in an amount to be proven at trial.

## SEVENTEENTH CAUSE OF ACTION
### Specific Performance
### (Against Harbinger, Eberts, Weicker, Fielkow, and Charbonneau)

278.   Canoo hereby repeats and incorporates by reference the allegations set forth above.

279.   As discussed above, Canoo and the Former Canoo Employees executed the Confidentiality Agreement (a specifically enforceable contract) that is sufficiently certain in its terms; namely, the Former Canoo Employees agreed to assign to Canoo, all inventions (and all intellectual property associated therewith) that they created and/or developed while employed at Canoo.

280.   Canoo and the Former Canoo Employees further executed the Separation Agreement (a specifically enforceable contract) that is sufficiently certain in its terms; namely, the Former Canoo Employees agreed (by reaffirming the terms of the Confidentiality Agreement) to assign to Canoo, all inventions (and all intellectual property associated therewith) that they created and/or developed while employed at Canoo.

281.   Canoo has performed all of its obligations under the Confidentiality Agreement, except to the extent that such performance has been prevented, hindered, excused, and/or waived by the Former Canoo Employees.

282.   The Former Canoo Employees have refused to comply with the terms of the Confidentiality Agreement, as discussed above, by among other things refusing and/or failing to assign to Canoo, the inventions and associated intellectual property that they created and/or developed while employed at Canoo.

283.   Canoo has no adequate remedy at law because the inventions and associated intellectual property in issue are unique.

284.   Canoo prays that the Court order the Former Canoo Employees to specifically perform under the Confidentiality Agreement by transferring to Canoo, all of the inventions and associated intellectual property that they created and/or developed while employed at Canoo.

## REQUEST FOR PRELIMINARY INJUNCTIVE RELIEF

285.   Canoo incorporates and realleges the allegations set forth above as if fully set forth herein.

286.   Canoo demonstrated, and the evidence to be presented at a hearing and/or trial will show, that Canoo has a likelihood of success on the merits of one or more of its claims set forth in its Complaint.

287.   In addition, Canoo will be irreparably harmed without preliminary injunctive relief that restores the status quo ante between Canoo and Defendants before Defendants committed one or more of the wrongful acts described in this

Complaint.

288.   Canoo has no adequate remedy at law for the ongoing and threatened conduct in that it would be impossible for Canoo to determine the precise amount of damages Canoo will suffer if Defendants' conduct is not restrained, and Canoo will continue to be deprived of certain employees, vendors, and customers which cannot be compensated in damages.

289.   A balancing of the equities favors the entry of preliminary injunctive relief upon a hearing before the Court, in favor of Canoo and, without the entry of such relief, Canoo will suffer a greater hardship than Defendants would suffer if such relief were entered.

290.   It is in the public interest that confidential information remain protected and that the integrity of protected computers remains intact, rather than the alternative: unabated breaches of confidentiality agreements, disclosures of confidential and trade secret information.

## **DEMAND FOR RELIEF**

**WHEREFORE**, Plaintiff Canoo Technologies, Inc. asks this Court to enter Judgment against the Defendants, as follows:

1.     For compensatory damages in an amount to be determined at trial together with interest thereon at the legal rate;

2.     For punitive and exemplary damage in an amount appropriate to punish or set an example of Defendants;

3.     For disgorgement of all monies unjustly received by Defendants and retained at the expense of Canoo;

4.     For an accounting of all gains, profits, and advantage derived from Defendants' unlawful conduct;

5.     For an order assigning to Canoo all inventions developed by the Former Canoo Employees, including but not limited to Harbinger's skateboard technology and any inventions related thereto;

1    6.    For preliminary and permanent injunctive relief ordering Defendants to
2  refrain from using or disclosing all trade secrets of Canoo in their possession,
3  custody, or control;

4    7.    For preliminary and permanent injunctive relief ordering Defendants to
5  refrain from further violations of the Business and Professions Code;

6    8.    For preliminary and permanent injunctive relief ordering Defendants to
7  refrain from hiring and/or engaging Canoo employees or independent contractors
8  who are subject to enforceable contracts with Canoo;

9    9.    Preliminary and permanent injunctive relief prohibiting any further
10 wrongful possession, disclosure, and/or misuse of Canoo's Trade Secrets and
11 Confidential Information, and preventing Defendants from profiting or benefiting
12 from their wrongful conduct;

13    10.    Ordering Defendants to return to Canoo, and purge from their
14 possession, custody, and control, any and all documents, computer-based files or
15 data, or information in any form, whether originals, copies, compilations, or
16 derivations, which were removed from Canoo or Canoo-owned computers issued to
17 the Poached Employees by Canoo, or which were obtained by Defendants or anyone
18 acting on their behalf or in concert with them;

19    11.    An order that Defendants return any and all of Canoo's Trade Secrets
20 and Confidential Information, and an order prohibiting any further use or benefit from
21 the use of such information;

22    12.    For Canoo's attorney's fees and costs;

23    13.    For prejudgment and post judgment interest at the maximum legal rate,
24 as provided by the laws of the state of California, as applicable;

25    14.    For specific performance ordering the Former Canoo Employees to (i)
26 return to Canoo, all confidential information and trade secrets owned by Canoo; and
27 (ii) assign to Canoo, all of the inventions and associated intellectual property that
28 they created and/or developed while employed at Canoo; and

15.    For such other and further relief as the Court deems just and proper.

Dated:  December 22, 2022          **MUNCK WILSON MANDALA, LLP**


By: */s/ Yael Tobi*
Yael Tobi

Attorneys for Plaintiff
Canoo Technologies, Inc.

**COMPLAINT**

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury of all issues so triable.

Dated:  December 22, 2022                    **MUNCK WILSON MANDALA, LLP**


By: */s/ Yael Tobi*
      Yael Tobi

Attorneys for Plaintiff
Canoo Technologies, Inc.