1  Yael Tobi (SBN 231425)
   *ytobi@munckwilson.com*
2  William A. Munck (*Pro Hac Vice*)
   *wmunck@munckwilson.com*
3  Ursula Smith (*Pro Hac Vice*)
   *usmith@munckwilson.com*
4  Aaron B. Gottlieb (*Pro Hac Vice*)
   *agottlieb@munckwilson.com*
5  **MUNCK WILSON MANDALA, LLP**
   1925 Century Park East, Suite 2300
6  Los Angeles, California 90067
   Telephone:   (310) 855-3311
7  Facsimile:   (972) 628-3616

8  Attorneys for Plaintiff
   Canoo Technologies, Inc.

9

10  **UNITED STATES DISTRICT COURT**

11  **CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

| | |
|---|---|
| 12  Canoo Technologies, Inc., a Delaware Corporation, | Case No. 2:22cv09309-FLA (JCx) |
| 13 | **FIRST AMENDED COMPLAINT FOR:** |
| 14       Plaintiff, | 1) **MISAPPROPRIATION OF TRADE SECRETS IN VIOLATION OF THE DEFEND TRADE SECRETS ACT, 18 U.S.C. § 1836, *ET SEQ.*** |
| 15  v. | |
| 16 | 2) **MISAPPROPRIATION OF TRADE SECRETS IN VIOLATION OF THE CALIFORNIA UNIFORM TRADE SECRETS ACT, CAL. CIV. CODE § 3426.1** |
| 17  Harbinger Motors, Inc., a Delaware Corporation; Electron Transport Inc., a Delaware Corporation; John Henry Harris; Will Eberts; Phillip Weicker; Alexi Charbonneau; Michael Fielkow; Benjamin Dusastre; Overture Climate LLC; Schematic Ventures, LLC; Tiger Global Management, LLC; Ridgeline Partners, LLC; Bharat Forge; Ironspring, LLC; Jackson Moses; Thor Industries, Inc.; and DOES 1 through 100, | |
| 18 | 3) **BREACH OF THE CONFIDENTIALITY INFORMATION AND INVENTIONS ASSIGNMENT AGREEMENT** |
| 19 | 4) **BREACH OF THE SEPARATION CONTRACT** |
| 20 | 5) **INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS** |
| 21 | 6) **NEGLIGENT INTERFERENCE WITH PROSPECTIVE ECONOMIC RELATIONS** |
| 22 | |
| 23 | 7) **BREACH OF FIDUCIARY DUTY** |
| 24 | 8) **AIDING & ABETTING BREACH OF DUTY OF LOYALTY** |
| 25       Defendants. | 9) **BREACH OF DUTY OF LOYALTY** |
| 26 | 10) **AIDING & ABETTING BREACH OF DUTY** |

27

28

11) **FRAUD IN THE INDUCEMENT OF THE CONFIDENTIALITY INFORMATION AND INVENTIONS ASSIGNMENT AGREEMENT**
12) **FRAUD IN THE INDUCEMENT AS TO THE SEPARATION CONTRACT**
13) **UNFAIR COMPETITION IN VIOLATION OF CAL. BUSINESS AND PROFESSIONS CODE § 17200,** *ET SEQ.*
14) **UNJUST ENRICHMENT**
15) **SPECIFIC PERFORMANCE**

**DEMAND FOR JURY TRIAL**

Plaintiff Canoo Technologies, Inc. ("Plaintiff" or "Canoo"), through its undersigned counsel, files its First Amended Complaint for damages and injunctive relief, respectfully stating as follows:

## I.   **INTRODUCTION**

1.      This is a case of corporate espionage in which a group of Canoo's former employees conspired together to steal Canoo's intellectual property (including its confidential information and trade secrets) and human capital to create Defendant Harbinger Motors, Inc. ("Harbinger"), now a competitor of Canoo in the fiercely competitive marketplace for Electric Vehicles ("EV").[1]

2.      Canoo develops cutting-edge technology in the EV space, including technology related to its independent driving platform called the "skateboard." While "skateboard" driving platforms are common in the EV space, Canoo has invested considerable time, human resources, and hundreds of millions of dollars to develop (among other skateboard-related technology) the first true "steer-by-wire" skateboard platform ("Skateboard Technology"). Canoo's Skateboard Technology eliminates the physical connection between the steering column and wheels, allowing Canoo to use the same platform to develop multiple products with different "top hats" depending on the needs of its customers.

3.      After developing its Skateboard Technology, Canoo invested heavily in building business plans to commercialize its EV technology. Canoo retained a world-renowned consulting firm to assist in formulating, vetting, and proving a business plan centered solely around its Skateboard Technology. One such business plan included exploring joint venture opportunities with third-party original equipment manufacturers ("OEM")—including Morgan Olson ("MO")—who could integrate

---

[1] Canoo and Harbinger both operate in the EV market and compete for the same customers, compete for the same capital investments, and compete for the same vendors and suppliers.

Canoo's driving platform into their pre-existing fleet of vehicles (the "Step-Van Program").

4. Given the immense time commitment and financial investment in its technology and business plan, Canoo takes extensive measures to protect its intellectual property portfolio—including its underlying confidential information and trade secrets. Among other measures, Canoo requires (i) new employees to execute strict confidentiality and invention assignment agreements, (ii) departing employees to execute separation agreements prohibiting the use and/or disclosure of Canoo's confidential information, and (iii) its partners and suppliers to execute strict non-disclosure agreements.

5. Defendants Phillip Weicker ("Weicker"), Will Eberts ("Eberts"), and Alexi Charbonneau ("Charbonneau") enjoyed access to virtually every facet of Canoo's EV technology and business model. Weicker, Eberts, and Charbonneau—each integral in developing Canoo's Skateboard Technology—are intimately familiar with Canoo's confidential information and trade secrets underlying such technology. Weicker and Charbonneau—both also integral in developing Canoo's Step-Van Program and overseeing modifications to Canoo's Skateboard Technology to adapt to delivery vans—also know Canoo's strategic growth plan, including the strategic partnerships Canoo is pursuing.

6. Defendants Weicker, Eberts, and Charbonneau were each subject to strict contractual and statutory duties not to use and/or disclose Canoo's confidential information and trade secrets to any third party and to assign any inventions (and modifications thereto) developed by them while working at Canoo. Like all employees, Weicker, Eberts, and Charbonneau executed (at the start of their employment) confidentiality and invention assignment agreements and (at the end of their employment) separation agreements.

7. Nonetheless, Weicker and Eberts (later joined by Charbonneau and Michael Fielkow ("Fielkow")) left Canoo to start Harbinger using Canoo's trade

secrets and confidential information, including technology and modifications they developed or began to develop while still at Canoo.  Subsequently, Harbinger strategically recruited at least 34 of Canoo's key technical employees to join Harbinger, **making up approximately 66% of Harbinger's total workforce**.  Many of these ex-Canoo employees now occupy senior positions at Harbinger and perform the **same** engineering roles and **design** roles at Harbinger that they previously held at Canoo.  In other words, these employees picked up at Harbinger right where they left off at Canoo.

8.    Armed with Canoo's technology, business plan, vendor and supplier relationships, and human capital, Harbinger sold the idea of a "ready-made EV" company to early investors, including the Investor Defendants.[2]  Before choosing to invest in a fledgling start-up like Harbinger, any sophisticated investment firm (like the Investor Defendants) would first conduct thorough due diligence, which would have shown (at minimum) that (i) Harbinger was formed by former employees from Canoo, (ii) Harbinger's founders (with the exception of Harris) each executed a non-disclosure agreement and invention assignment agreement with Canoo, (iii) Harbinger had developed intricate EV technology at implausibly fast speeds, and (iv) Harbinger had already poached six of Canoo's employees with plans to poach significantly more of Canoo's key technical employees, supply chain managers, and sales people.

9.    The Investor Defendants thus knew that Weicker and Eberts had taken Canoo's trade secrets (in particular, the trade secrets underlying Canoo's Step-Van Program) and were using that information (with Harbinger and Harris) to unfairly compete with Canoo.  By December 2021—a mere 10 months after its formation— Harbinger was valued at $75 million without any significant outside capital

---

[2] The Investor Defendants refers to Defendants Overture Climate LLC, Schematic Ventures, LLC, Tiger Global Management, LLC, Ridgeline Partners, LLC, Bharat Forge, Ironspring, LLC, and Jackson Moses.

investment. Such a high valuation was based on Canoo's intellectual property (including its Skateboard Technology, Step-Van Program, and its employee capital) taken by Harbinger. The Investor Defendants thus chose to invest a combined **$28 million** in Harbinger to take Harbinger to the next phase—further development of Canoo's technology. Having bypassed the significant time and millions of dollars necessary for research, design failures, and the development of a sophisticated EV company, the Investor Defendants stand to gain an enormous profit if Harbinger is successful – all at the expense of Canoo.

10.    Less than a year later, in September 2022, Harbinger unveiled its very own EV platform for medium-duty vehicles.  Harbinger had developed a business model targeting OEM partnerships (like **Canoo**) using a driving platform (like **Canoo**) with drive-by-wire technology (like **Canoo**) developed by former employees **from Canoo**. It is inconceivable that a startup like Harbinger could have independently designed, developed, tested, and produced this technology only 14 months after its formation unless Harbinger misappropriated significant amounts of Canoo's intellectual property and human capital.  There is little question that Harbinger, with the assistance of the Investor Defendants, misappropriated Canoo's Skateboard Technology and Step-Van Program.

11.    In sum, Canoo's Step-Van Program is the foundation of Harbinger's operations, and Canoo's intellectual property is the foundation of Harbinger's driving platform.  Canoo therefore brings this action to stop Defendants' illegal conduct and redress the harm caused to Canoo.

## II.    PARTIES

12.    Plaintiff Canoo Technologies, Inc., an electric vehicle designer and manufacturer, maintains its headquarters in Torrance, California.

13.    Defendant Electron Transport Inc., ("Electron") is a Delaware Corporation with a principal place of business in Los Angeles County, California. Electron has appeared generally herein.

14.    Defendant Harbinger Motors, Inc., a manufacturer of electric vehicles, maintains its principal place of business in California.    Harbinger has appeared generally herein.

15.    Defendant John Henry Harris is an individual residing in California. Harris has appeared generally herein.

16.    Defendant Benjamin Dusastre is an individual residing in California. Dusastre has appeared generally herein.

17.    Defendant William Eberts is an individual residing in California.  Eberts has appeared generally herein.

18.    Defendant Phillip Weicker is an individual residing in California. Weicker has appeared generally herein.

19.    Defendant Alexi Charbonneau is an individual residing in California. Charbonneau has appeared generally herein.

20.    Defendant Michael Fielkow is an individual residing in California. Fielkow has appeared generally herein.

21.    Eberts, Weicker, Charbonneau, and Fielkow are collectively referred to herein as the "Former Canoo Executives."  The Former Canoo Executives, together with Harbinger, are referred to herein as the "Harbinger Defendants."

22.    Defendant Overture Climate LLC ("Overture") is an early-stage venture fund headquartered in Los Angeles, California.  Overture has appeared generally herein.

23.    Defendant Schematic Ventures, LLC ("Schematic Ventures") is a venture capital fund headquartered in San Francisco, California.  Schematic Ventures has appeared generally herein.

24.    Defendant Ridgeline Partners, LLC ("Ridgeline") is a venture capital firm headquartered in Los Angeles, California.  Ridgeline has appeared generally herein.

/ / /

25.    Defendant Jackson Moses ("Moses") is an individual residing in the State of Colorado.  Moses has appeared generally herein.

26.    Defendant Ironspring, LLC ("Ironspring") is a venture capital fund headquartered in Austin, Texas.  Ironspring has appeared generally herein.

27.    Defendant Tiger Global Management, LLC ("Tiger Global") is an investment firm headquartered in New York, New York. Tiger Global has appeared generally herein.

28.    Defendant Bharat Forge Limited ("Bharat Forge") is a foreign technology company headquartered in Pune, Maharashtra, India. Bharat Forge has appeared generally herein.

29.    Overture, Schematic, Ridgeline, Moses, Ironspring, Tiger Global, and Bharat Forge shall collectively be referred to herein as the "Investor Defendants."

30.    Defendant Thor Industries, Inc. ("Thor") is a Delaware corporation headquartered in Elkhart, Indiana. Thor has appeared generally herein.

### III.    JURISDICTION AND VENUE

31.    This Court has jurisdiction over this matter pursuant to 18 U.S.C. § 1836(c) and 28 U.S.C. §§ 1331, 1367.  Canoo's claims arise, in part, under federal law, specifically the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1831 *et seq*.

32.    This Court has supplemental jurisdiction over Canoo's state law claims pursuant to 28 U.SC. § 1367 because those claims are so related to Canoo's federal claims that they form part of the same case or controversy.

33.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this judicial district and some of the defendants reside in, do business in, and/or maintain a principal place of business is in this jurisdiction.

34.    This Court has *in personam* jurisdiction over Defendants.   In the agreements that are the subject of this action, the Former Canoo Executives voluntarily and intentionally submitted to the exclusive jurisdiction of the courts in

Los Angeles County, California. The Investor Defendants have engaged in continuous, regular, and systematic relations with this jurisdiction, including investing in a company in this jurisdiction. For example, the Investor Defendants invested in a company whose operations would be conducted almost exclusively in California; and their investments provided Harbinger with the capital needed to develop technology using Canoo's stolen intellectual property. The assertion of personal jurisdiction over the Investor Defendants will not offend traditional notions of fairness and substantial justice under Constitutional due process principles.

## IV.    GENERAL ALLEGATIONS

### A.    Overview of Canoo

#### A1.    Canoo Develops its Modular Skateboard Driving Platform.

35.    Canoo is an electric automotive company formed in 2017. Canoo's skateboard platform forms the core of its product offering. Canoo has invested years and hundreds of millions of dollars developing and perfecting its skateboard platform, which incorporates Canoo's intellectual property portfolio—including its trade secrets, patents, copyrights, trade dress, designs, and contractual programs.

36.    Canoo has developed the first skateboard platform with a fully functioning rolling chassis and the industry's first true "steer-by-wire" system (the "Skateboard Technology"). Canoo's Skateboard Technology allows the driving platform to be driven without a "top hat" cabin, and the "steer-by-wire" system eliminates the physical connection between the steering column and the wheels—allowing the steering wheel to be moved to suit any cabin design or driver position. Canoo's Skateboard Technology enables Canoo to modulate the skateboard to fit the needs of its retail or commercial customers at reduced manufacturing costs while maintaining the same power and maneuverability with each product offering.

#### A2.    Canoo Charts its Path Forward with the Step-Van Program.

37.    After developing its Skateboard Technology, Canoo forged its path forward, investing heavily in developing business plans to best commercialize its

technology. While Canoo had previously focused its efforts on developing lightweight vehicles, Canoo found the modularity of its Skateboard Technology made it uniquely well-suited for step-van delivery vehicles where the same gas-powered chassis remains in use for nearly all iterations of delivery vans. Canoo thus explored joint venture opportunities with third-party OEMs who could implement Canoo's Skateboard Technology to convert their pre-existing gas-powered fleets to electric (the "Step-Van Program").

38.    Canoo's Step-Van Program became pivotal to Canoo's long-term success, as it represented Canoo's expansion from the lightweight vehicle class to the delivery van marketplace in which Canoo planned to develop an electric chassis.

39.    Canoo identified Morgan Olson ("MO") as a potential OEM partner to test its Step-Van Program. If Canoo could form a successful partnership with MO, then Canoo could expand its Step-Van Program to other OEMs.

40.    In August 2020 Canoo entered a Mutual Non-Disclosure Agreement ("NDA") with MO. MO revealed to Canoo what it was looking for in an EV partner, including vehicle specifications, timelines, pricing information, and the structure of the desired relationship.

41.    In September through December 2020, and in conjunction with Canoo's exploration of the Step-Van Program, Canoo spent tens of millions of dollars to engage a leading business consulting firm (the "Consulting Firm") to (i) analyze EV markets, business opportunities, market penetration strategies, customer interests, competitors, market demand, (ii) assess Canoo's relative competitiveness in the EV space, and (iii) vet its Step-Van Program.

42.    The Consulting Firm issued several reports with valuable confidential information and trade secret information (defined below as Customer Information, Market Information, Business Information, and Product Information), providing detailed analysis regarding (i) Canoo's competitive position within the EV market, (ii) customer wants and needs in different market segments, (iii) potential competitors

in different market segments, (iv) Canoo's advantages and disadvantages vis-à-vis its actual and potential competitors within each market segment, and (v) various market penetration strategies (like selling its Skateboard Technology as a standalone product versus selling a full vehicle versus offering a monthly subscription model).

43.    According to the Consulting Firm's comprehensive analysis, Canoo's Step-Van Program was potentially highly profitable.  Canoo therefore moved forward with developing, refining, and retooling its Skateboard Technology to accommodate delivery vans, and pursued the MO partnership.

### A3.    Canoo's Trade Secrets and Confidential Information.

44.    Canoo's success is based largely on safeguarding the intellectual property portfolio—including trade secrets and confidential information—underlying its Skateboard Technology and Step-Van Program.  Canoo's trade secret information, which is not generally known or readily ascertainable, includes the following categories of information (collectively, the "Trade Secrets"):

a.    **Employee Information** includes (1) summaries of employee skills, evaluations, duties, and responsibilities; (2) Canoo's People Recruiting Scorecard; (3) the terms of Canoo's contracts and/or agreements with its employees, including compensation, profit participation percentages, bonuses, benefits, audit rights, intellectual property rights, termination provisions, insurance requirements, confidentiality provisions and non-solicitation provisions, all of which are confidential and would be extremely valuable to competitors in their efforts to solicit such employees; (4)  the amount of business Canoo's employees have generated (in terms of volume revenue); (5) work performed in connection with Canoo's intellectual property portfolio; (6) the formulas for determining employee compensation; and (7) performance evaluations.

b.    **Intellectual Property Protection Strategies and Programs.** Canoo developed and maintains a comprehensive market-focused intellectual property portfolio to (i) create barriers of entry; (ii) attract investors; and (iii) increase Canoo's value.  Canoo's trade secrets include its intellectual property protection strategies and

programs that protect its intellectual property portfolio while maximizing Canoo's intangible asset value. Canoo's trade secrets also include its intellectual property procurement strategies, which include domestic and international patent claim drafting and prosecution strategies, as well as patent specification adequacy.

c.    **Skateboard Technology Information** includes the trade secret information underlying Canoo's: Training Machine Learning Models (Active Data Collection, Sampling, and Generation); Augmented Pseudo-Labeling for Object Detection Learning; Autonomous Lateral Control; Battery Module Enclosures; Bumper Ends; Charger and Charging Device; Drive Unit Cooling and Lubrication System; Design Methods; Door Handles; Electric Multi-Platform Reconfigurable Vehicle; Electric Vehicle Platform; Emergency Motion Control; Predictive Distribution (EPD)-Based Confidence System; Fisheye Collage Transformation; Electric Vehicle Motors; Frunk Cover; Impact Features; Accessories; LED Matrix Display; Low Inductance Dual-Full Bridge Power Supply Module; Manufacturing Process; Metamorphic Labeling; Methods and Systems for Battery Pack Thermal Management; Multiple-Discharge Rain Manifold for Electric Motor Cooling and Related System and Method; Path Tracking Control; Prediction Of Target Object's Behavior; Proximity Detection; Rear Bumper; Roof Rack; Safari Glass; Single Conductor Layer Cell-to-Cell Interconnect for Power Supply; Slide Out Bed Floor; Drive by Wire Systems; Vehicle Control Systems; Steer-by-Wire Systems and Methods; Suspension System; System and Method for Lane Departure Warning; System and Method for Target Behavior Prediction; System and Method in Data-Driven Vehicle Dynamic Modeling for Path-Planning and Control; System and Method in Lane Departure Warning; System and Method in the Prediction of Target Vehicle Behavior; System and Method in Vehicle Path Prediction Based on Full Nonlinear Kinematics; System and Method in Vehicle Path Prediction; System and Methods of Integrating Vehicle Kinematics and Dynamics for Lateral Control Feature at Autonomous Driving; HVAC Systems; Thermal Management Systems; Transmission Lock; Vehicle Object Detection; Vehicle Air Vent; Vehicle External Features; Vehicle Motion Control; and Vehicle Seating Systems & Seating Restraining Systems.

d.    **Customer Information** includes (i) Canoo's carefully compiled and curated list of current and prospective customer names and

contact information.  These lists were compiled through internal research and external consultants; (ii) Canoo's confidential information related to its undisclosed pricing, discount information, payment terms offered to customers or potential customers, analyses of customer demands, buying preferences, feedback and needs, previous discussions with customers, and proposed technical engineering specifications; (ii) Information received from Canoo's current and prospective clients subject to a confidentiality agreement with Canoo.

e.    **Vendor Information** includes (i) Canoo's lists of actual and potential vendors, including but not limited to their contact information, product and service pricing, contract terms, and performance ratings, and (ii) information received from any vendor subject to a confidentiality agreement with Canoo.

f.    **Market Information** includes Canoo's market analysis and forecasting reports of market trends, market pricing information trends, market intelligence about the needs of potential customers, and target markets for selling Canoo's products.

g.    **Business Information** includes (A) Canoo's program and initiative frameworks, multi-year strategic plans, marketing plans, anticipated product and service offerings, and projections for targeting (and/or expanding into) specific markets. (B) Canoo's business plans (including the Step-Van Program), which include (1) potential joint venture opportunities with OEMS; (2) potential supplier and manufacturer costs and timelines; (3) the architecture of proposed deals with OEMs and strategic partners; (4) information regarding market penetration; and (5) all reports prepared by the consulting firm referenced above.  (C) Lists of Canoo's consultants, independent contractors, and strategic partners. (D) Canoo's methodologies, strategies, programs, and systems used in managing assets, liabilities, and risk, and/or soliciting, marketing, selling, and providing products and services to its customers.

h.    **Investor Information** includes carefully compiled and curated list of actual and potential investors (including their contact information, investment amounts, financials, and confidential discussion) and Canoo's confidential pitch decks.

---

i.   **Sales Information** includes (1) Canoo's price and cost information consisting of payment terms, current manufacturing and production costs, labor costs, overhead, revenue, price targets, price forecasts, and Canoo's financial policies and procedures.   (2) Canoo's confidential sales reports containing detailed customer pricing information for specific customers, customer discounting information, and ordering information for Canoo's products. (3) Canoo's profit margin data and sales techniques. (4) Canoo's negotiated terms and pricing with vendors and customers.

j.   **Product Information** consists of Canoo's product specifications and features, product architecture, product development plans, new product developments, new product launch dates and schedules, product pipelines, product reliability information, product milestones, product budgets, and product roadmaps.

k.   **Negative Information** includes know-how about what does not work related to Canoo's electric vehicle technology.

45.    Generally, Canoo's Trade Secrets are valuable—and derive independent economic value to Canoo—in part because the information allows Canoo to modulate its skateboard platform to fit the exact needs and preferences of its customers.  In particular:

a.   Canoo's Customer Information has independent economic value because Canoo has spent years and incurred significant expense to identify its customers, identify their key decision-makers, develop relationships with those decision-makers, solicit business from those customers, and develop and customize a pricing and marketing strategy for its customers.   Canoo's customer information would enable competitors to direct sales efforts to reach those customers already doing business with Canoo.

b.   Canoo's Sales Information has independent economic value because it provides actionable insight into product performance, helps Canoo refine its business strategies, and improves organizational decision-making, and would enable Canoo's

competitors to set pricing policies that meet or undercut Canoo's.

c.  Canoo's Employee Information has independent economic value because the underlying information would enable a competitor—like Harbinger—to strategically recruit away Canoo's employees.

d.  Canoo's Negative Information has independent economic value because—through extensive research and development—it enables Canoo to know exactly what works and what does not work in relation to its Skateboard Technology and Step-Van Program.

e.  Canoo's Product Information has independent economic value because the information would allow competitors—like Harbinger—to strategically launch EV products at a specified date to undercut future Canoo products.

f.  Canoo's Investor Information has independent economic value because the information provides actionable insight to secure needed capital and would allow Canoo's competitors to solicit such investors to Canoo's detriment.

g.  Canoo's Vendor Information, compiled after years of effort, has independent economic value because (i) due to the nature of the automotive industry, product supply chains are limited, and (ii) through years of trial and error, Canoo has compiled a list that identifies vendors who sell high quality products at good value.

h.  Canoo's Market Information and Business Information has independent economic value because it explores the needs of numerous, diverse buyers of Canoo's products and would allow Canoo's competitors to predict and counter Canoo's product launches, Canoo's advertising, and Canoo's marketing.

/ / /

/ / /

**A4.    Canoo Takes Reasonable Measures to Protect its Trade Secrets and Confidential Information.**

46.    Canoo takes extensive measures to protect its Trade Secrets and Confidential Information, including the following measures:

47.    **Security Protocols**:  Canoo's offices have physical and electronic security systems, including gates, fencing, keycard-access and keypad-locked doors, electronic surveillance and cameras, and security personnel.  Electronic access to its computer network is restricted and electronic access to its datafiles and databases is limited to a "need to know" basis.  Canoo's computer systems, servers, and networks require each user to have a unique password, and all remote access (like VPN) requires dual-factor authentication.

48.    **Employee Confidentiality Agreements**:    As   a   condition   of employment, Canoo requires its employees to execute Confidential Information and Inventions   Assignment   Agreements   ("Confidentiality   Agreement").     The Confidentiality Agreement prohibits (among other things) the unauthorized use and/or disclosure of Canoo's Trade Secrets and confidential information (as defined therein).  The Confidentiality Agreement also includes an invention assignment provision whereby the employees assign to Canoo, all right and title to any inventions made or conceived while at Canoo.

49.    Strict adherence to the Confidentiality Agreement is critical to Canoo's operations, as Canoo's current and former employees have developed and/or contributed to Canoo's trade secrets and confidential information and have expanded the scope and content of Canoo's intellectual property portfolio.

50.    **Employee Separation Contracts**:  Upon departure from Canoo, Canoo requires each employee to execute an Employee Separation Information Letter ("Separation Agreement").   The Separation Agreement: (1) strictly prohibits the employees from emailing any Canoo documents or information to a personal email account and requires the immediate deletion of any such document or emails with

written confirmation to Canoo of such deletion; (2) requires the employees to return of all Canoo equipment and documents in the possession of the departing employee; and (3) expressly requires the employees "to observe and abide by the terms of the Confidentiality Agreement," which includes the inventions assignment provision.

**B.** **Weicker, Charbonneau, and Eberts Misappropriate Canoo's Trade Secrets and Confidential Information.**

**B1.** **Weicker, Charbonneau, and Eberts Join Canoo.**

51. Canoo's Skateboard Technology was developed by top industry engineers like Weicker, Charbonneau, and Eberts.

52. In or around December 2017, Weicker joined Canoo as the lead development engineer in charge of Canoo's powertrain and electronics system, exercising the highest level of management authority over that division.

53. Weicker's duties and responsibilities at Canoo included leading the clean-sheet development[3] of Canoo's electric drive system, battery system, power electronics, and electrical architecture. Weicker was also the lead inventor of Canoo's structural battery approach. He supervised and managed hundreds of employees, exercised control over hiring and firing employees, and established objectives and key initiatives at Canoo.

54. In or around December 2017, Charbonneau joined Canoo as the head engineer in charge of skateboards and cabin, exercising the highest level of management authority over that division.

55. Charbonneau controlled his department's budget, exercised control over hiring and firing decisions, and established objectives and initiatives. He supervised numerous technical employees across many of Canoo's EV design projects.

---

[3] Clean-sheets analyze a product's cost structure to help manufacturers optimize design and capture savings.

56.     In or around September of 2018, Eberts joined Canoo as the engineer in charge of Battery & Powertrain Development, exercising management authority over Canoo's battery and powertrain divisions, reporting directly to Weicker.

57.     Through their leadership and managerial positions with Canoo, Weicker, Charbonneau, and Eberts enjoyed unfettered access to Canoo's Trade Secrets, financial resources, business plans, human capital, and other intellectual property.  For that reason, Canoo required Weicker, Eberts, and Charbonneau (like all Canoo employees) to sign Confidentiality Agreements.

**B2.    <u>Harris, Eberts, Weicker, and Charbonneau Acquire Canoo's Trade Secrets and Confidential Information</u>.**

58.     Canoo believes that Harris, Eberts, Weicker, and Charbonneau always intended to <u>own and control</u> their own EV company.  Thus, if they were to leave Canoo for whatever reason, they always planned to take with them Canoo's Trade Secrets and confidential information and inventions they developed while at Canoo to start a new EV company.

59.     Thus, when Weicker, Charbonneau, and Eberts executed the Confidentiality Agreement and Separation Contract, they never had any intention of complying with their terms.

60.     In July 2019, Eberts left Canoo to join Harris at Anduril Industries (a military defense contractor), taking with him Canoo's Trade Secrets and confidential information.

61.     After Eberts left, Weicker and Charbonneau remained at Canoo.  The two embedded themselves at Canoo, taking on any task that would give them broad access to (and directional control of) Canoo's technology, intellectual property portfolio and various lines of business.  Weicker and Charbonneau spent their days learning the names and jobs of key engineers, commodity purchasers, and business development professionals, as well as Canoo's suppliers, vendors, investors, and partners.

62.     Weicker (and to a lesser extent, Charbonneau) took a leading role in developing Canoo's Step-Van Program.    The Step-Van Program required modifications to Canoo's existing Skateboard Technology to accommodate a larger weight class, and Canoo tasked Weicker and Charbonneau with managing those modifications.

63.     As part of their work on the Step-Van Program, Weicker met with investors, created slide decks, and worked with other Canoo employees.  For the next five months, Weicker became intimately familiar with virtually every aspect of the Step-Van Program.

64.     Having embedded themselves in all aspects of Canoo's Skateboard Technology and Step-Van Program, Weicker and Charbonneau began sharing Canoo's Trade Secrets and confidential information with their co-conspirators, Harris and Eberts.[4]

65.     In September 2020, Weicker was actively consulting with Harris about the details of Canoo's Step-Van Program, divulging to Harris Canoo's Trade Secrets related to Canoo's efforts to modify its Skateboard Technology to partner with OEMs.

66.     Once Canoo's consultant validated its Step-Van Program, Harris, Eberts, Weicker, and Charbonneau now had not only the intellectual property necessary to build a functional EV product, but also a business plan to quickly commercialize it—all based on the Trade Secrets and confidential information misappropriated from Canoo.

---

[4] Throughout his tenure at Canoo, Weicker stole Canoo's Trade Secrets and confidential information by forwarding emails to his personal email account as well as copying, downloading, and/or uploading Canoo's confidential documents, including portable units. Weicker then shared such information with Harbinger, Harris, and Eberts.  Additionally, Canoo is informed and believes, and on that basis alleges, that while Weicker was at Canoo, he and Charbonneau conspired to and did intentionally sabotage Canoo's relationship with MO to allow Harbinger the opportunity to form such an advantageous partnership.

67.     Based on information and belief, after a new Chairman was appointed to Canoo's Board of Directors, in or about October 2020, Weicker and Charbonneau (together with the assistance of Harris and Eberts) decided to execute their plan to start a competing EV company and began to systematically misappropriate Canoo's Trade Secrets and confidential information for the benefit of their new EV company that would later become Harbinger.

68.     In December 2020, Weicker left Canoo, leaving Charbonneau as the primary co-conspirator to continue misappropriating Canoo's confidential information and Trade Secrets on Harbinger's behalf.

69.     Charbonneau would remain at Canoo for another twelve months before joining Harbinger in January 2022.

**B3.     Fielkow Acquires Canoo's Trade Secrets and Confidential Information.**

70.     Fielkow joined Canoo in April 2019 and served as its in-house counsel for 37 months, initially as Deputy General Counsel and subsequently as Vice President of Corporate Legal, Securities & Global Strategy.

71.     During this time Fielkow oversaw a broad spectrum of Canoo's in-house corporate legal and business matters, including strategic transactions and investments, corporate governance, board advisory, product development, intellectual property and technology licensing, IP litigation, regulatory compliance, securities law, data privacy, and commercial contracts with suppliers and partners.

72.     Fielkow gained intimate knowledge of Canoo's intellectual property portfolio (including its Trade Secrets and confidential information) and established relationships with Canoo's outside counsel that prosecuted Canoo's patents and registered their trademarks.  Indeed, as Canoo's in-house counsel, Fielkow was responsible for **developing, enhancing, and protecting** Canoo's intellectual property portfolio, particularly from misappropriation, usurpation, and unfair competition.

73.    Fielkow was also a member of Canoo's business development team where he assisted in setting and developing plans for business and revenue growth, researching and planning new market initiatives, and meeting with business partners. As such, Fielkow also had access to and gained intimate familiarity with Canoo's Step-Van Program.

74.    As an attorney, Canoo trusted Fielkow to provide advice and counsel free of fraud, theft, and divided loyalty.  As shown below, Fielkow grossly abused his fiduciary position, stealing untold amounts of Canoo's intellectual property, even misrepresenting on several occasions that he would not join a competitor (which, of course, he did).

**C.    Defendants Misappropriate Canoo's Trade Secrets.**

75.    Once Weicker, Charbonneau, Eberts, and Harris had stolen enough of Canoo's intellectual property to safely move forward with product development (and raise capital), they registered their new EV company as "Electron Transportation, Inc." ("Electron") with the Delaware Secretary of State in or about February 2021.

76.    Subsequently, in or about July 2021, Electron changed its name to Harbinger.

77.    According to Harbinger's website, Harbinger created:

[D]river-focused chassis architecture designed to improve safety, driver experience, and productivity. **The vehicles will feature autonomous-ready drive-by-wire steering and enhancements to vehicle ergonomics, including a best-in-class floor height below 28 inches, and a novel front suspension that reduces vehicle overhang**.

78.    On information and belief, several of these specifications—copied from Canoo's Skateboard Technology—were essential to the Step-Van Program and Canoo's partnerships with OEMs.  Canoo's Skateboard Technology is engineered to provide a vertically integrated platform with easy maneuverability, and a wide range of possible load volumes over a smaller footprint—all adapted for commercial fleet operator and other duty vehicle customer needs.

**C1.    Harbinger Systematically Poaches Canoo's Employees.**

79.    To build a product using Canoo's Skateboard Technology and execute Canoo's Step-Van Program, Eberts, Weicker, Charbonneau, and Harris knew that Harbinger would need talented engineers and employees deeply familiar with EV technology. And they knew exactly where to look. Using Canoo's confidential information and Trade Secrets related to Canoo's employees, Harbinger strategically recruited the following Canoo employees to work for Harbinger and bring with them the vast amount of confidential information and trade secrets that they themselves stole from Canoo:

| NAME | TITLE AT CANOO | DEPARTURE FROM CANOO | HARBINGER TITLE | STARTED AT HARBINGER |
|------|----------------|----------------------|-----------------|----------------------|
| William Eberts | Program Manager – Battery, Powertrain, & Power Electronics | 07/20/2019 | Co-Founder and Chief Operating Officer | March 2021 |
| Phillip Weicker | In charge of Property and Electric | 12/19/2020 | Co-Founder and Chief Technology Officer | March 2021 |
| Isaac Meadows | Electrical Engineer | 07/24/2021 | Electric Vehicle Engineer, Systems | July 2021 |
| Kenneth Kawanishi | Power Electronics Packaging Engineer & Battery Engineer | 08/19/2021 | Battery Mechanical Engineer | September 2021 |
| Jackson Diebel | Powertrain Engineer | 09/02/2021 | Powertrain Engineer | September 2021 |
| Dheemanth Uppalapati | Systems Engineer | 09/04/2021 | Senior Systems Engineer | September 2021 |

| NAME | TITLE AT CANOO | DEPARTURE FROM CANOO | HARBINGER TITLE | STARTED AT HARBINGER |
|------|----------------|----------------------|-----------------|----------------------|
| Anna Scheibengraber | Test Engineer, Battery Systems | 09/25/2021 | Battery Test Engineer | October 2021 |
| Adrian Alvarado | Senior Purchasing Manager | 11/02/2021 | Senior Supply Chain Analyst | June 2022 |
| Samuel Jantzi | Powertrain Engineer | 12/24/2021 | Powertrain Engineer | January 2022 |
| Aaron Youngblood | Lead EV Technician | 01/01/2022 | Senior Engineering Tech | January 2022 |
| Alexi Charbonneau | In Charge of Skateboard & Cabin | 01/01/2022 | Vice President of Structure and Chassis | January 2022 |
| Richard D. Walker IV | In charge of Controls | 01/22/2022 | Senior Software Engineer, Controls | January 2022 |
| Cody Rhebergen | Thermal Engineer | 02/04/2022 | Thermal Analysis Engineer | February 2022 |
| Daniel McCarron | In Charge Skateboard | 02/05/2022 | Senior Chassis Engineer | February 2022 |
| Jue Wang | Chassis Control Engineer | 02/11/2022 | Senior Chassis Controls Engineer | February 2022 |
| Steven Offutt[5] | In Charge – General Assembly, Powertrain, and Battery Engineering | 02/12/2022 | Director, Manufacturing | February 2022 |

---

[5] During his nearly four years at Canoo, Offutt was in charge of manufacturing, battery, powertrain, and general assembly. Offutt gained detailed knowledge of Canoo's technology, suppliers, service providers, assembly/sub-assembly, logistics, and business plans. He was also involved in developing and building a manufacturing facility able to build skateboards at scale for the Step-Van Program.

| NAME | TITLE AT CANOO | DEPARTURE FROM CANOO | HARBINGER TITLE | STARTED AT HARBINGER |
|---|---|---|---|---|
| Seth Lewis | Powertrain Engineer | 02/16/2022 | Thermal Analysis Engineer | March 2022 |
| Tae Won Park | CAE Engineer | 02/19/2022 | Principle, CAE Engineer | February 2022 |
| Kunal Gupta | Chassis Design Engineer | 03/03/2022 | Chassis Engineer, Suspension | March 2022 |
| Michael Fricke | Design Release Engineer – HV Battery | 03/10/2022 | HV Battery Pack Mechanical Engineer | March 2022 |
| Michael Fielkow | Vice President – Corporate Legal, Securities & Global Strategy | 03/11/2022 | General Counsel Security & Head of Corporate Development | March 2022 |
| Jigar Patel[6] | Commodity Director – Metals & Chassis | 03/12/2022 | Director, Supply Chain | March 2022 |

---

[6] During his 27 months at Canoo, Patel was the Director of Commodity Purchasing with Canoo in charge of Canoo's supplier relationships, production needs, and purchasing information. Patel's access to Canoo's purchasing needs and supplier relationships was critical to the profitability of Canoo's Step-Van Program, and integral to Harbinger's scheme. Recent evidence confirms Patel stole supplier lists from Canoo. While at Canoo, Patel was directly involved in exploring a supplier relationship with Kalyani Transmission Technology (a wholly-owned subsidiary of Bharat Forge, one of the Harbinger Investor Defendants), which signed an NDA with Canoo in July 2020. Kalyani's presentation(s) to Canoo outlined its product development and engineering capabilities, processes, and lead times. When Patel joined Harbinger in March 2022 and discovered Harbinger needed a manufacturing partner for the drivetrain in its driving platform, Patel looked to his supplier list stolen from Canoo. In September 2022, only five months after Patel jointed Harbinger, Harbinger announced a joint venture with Kalyani Powertrain Limited, an affiliate of Kalyani Transmission Technology.

| NAME | TITLE AT CANOO | DEPARTURE FROM CANOO | HARBINGER TITLE | STARTED AT HARBINGER |
|---|---|---|---|---|
| Pau Burgaya Julia | Senior Thermal Engineer | 03/19/2022 | Senior Thermal Engineer | April 2022 |
| Deb Bourke | Director, Battery Systems | 03/22/2022 | Director, Engineering Program Management | April 2022 |
| Garrett Allen | Powertrain Engineer, Lead Drive Unit DRE | 04/29/2022 | Senior Powertrain Engineer | May 2022 |
| Anthony Washington | Engineering Technician, Senior Design Prototype Engineering Technician | 05/28/2022 | Senior Engineering Tech | June 2022 |
| Mrudang Kadakia | Powertrain Test Engineer | 05/28/2022 | System Test Engineer | July 2022 |
| Will Smith | Lead Controls Engineer, Thermal Management | 06/04/2022 | Thermal Controls, Simulation and Testing | June 2022 |
| Oscar Arriola | Manufacturing Supervisor | 07/23/2022 | Senior Operator | July 2022 |
| Brent Caldwell | Senior Interior Systems Engineer | 10/01/2022 | Manager, Systems Integration | October 2022 |
| James Dameron | Motor Design Engineer | November 2022 | Senior Motor Design Engineer | November 2022 |
| Mandar Jadhav | Director of Supplier Quality Engineering | November 2022 | Director of Quality | November 2022 |

| NAME | TITLE AT CANOO | DEPARTURE FROM CANOO | HARBINGER TITLE | STARTED AT HARBINGER |
|------|----------------|----------------------|-----------------|----------------------|
| Zane Bodenbender | HV Systems Engineer | December 2022 | HV Systems Engineering Lead | December 2022 |

80.     To date, Harbinger has poached and hired at least 34 Canoo employees (the "Former Canoo Employees"), making up more than 66% of Harbinger's workforce.  When 66% of Harbinger's employees are former Canoo employees that perform the same roles at Harbinger as they previously held at Canoo, Harbinger's claimed intellectual property rights are actually Canoo's intellectual property rights.

**C2.    Harbinger Misappropriates Canoo's Trade Secrets and Confidential Information.**

81.     Harbinger's surreptitious scheme began to unravel in March 2022 when Canoo mistakenly received an email from one of its outside law firms that included three patent applications. Those patent applications listed Harris, Eberts, and Weicker as the inventors.

82.     These patent applications confirmed that Harbinger had engaged Canoo's own outside patent counsel for patent work—privileged information that only Fielkow would have known. It is particularly telling that Fielkow left Canoo for Harbinger on March 11, 2022, just six days **before** the patent applications were sent by mistake to Canoo.[7]  As the patent application drafting process is generally several months long, Harbinger's patent applications suggest the patent drafts were in process though at least the latter months of Fielkow's tenure at Canoo.[8]

---

[7] Even if the patent applications were not identical to Canoo's Skateboard Technology (or more broadly Canoo's EV technology), the patent applications were based on technology derivable from Canoo's technology, and Weicker, Eberts, and Charbonneau were under a contractual obligation to assign all such derivable works **to Canoo**.  Fielkow, an attorney, knew that.

[8] Canoo's outside law firm's and Fielkow's ethical duties and obligations to Canoo were neither disclosed, nor discussed, nor waived by Canoo.

83.    On September 14, 2022, an article titled "What the hell is Harbinger and Why are They Showing a Boring Delivery Van at the Detroit Auto Show?" appeared online in the Autopian, a startup website self-described as a "car-culture website run by obsessive car nerds."  The article discusses an auspicious blue delivery van on a sizeable plot of show floor marked Harbinger, stating:

> That blue van up there looks to be an off-the-rack Grumman MT45 step[-]van, also sold as a Freightliner MT45, or a Morgan Olson RouteStar, or some confusing combination of those names; it's a boring, useful delivery van, and I think that's the whole point.  You see, Harbinger is in the business of making electric delivery van chassis, and I think they're very smart to make them work with one of the most common van bodies available instead of succumbing to the temptation of making something sleek and cool and new looking that will get a lot of attention, but will be expensive and effectively unavailable.

84.    As captured in the article and using Harbinger's own words:

> Harbinger's scalable stripped chassis has been built to support all of the popular medium-duty body types available today, including commercial walk-in vans, recreational vehicles, box trucks, and others. The front overhang is reduced by Harbinger's innovative independent front suspension, and the tight integration of battery, powertrain, and frame allows a best-in-class floor height.  Steer-by-wire and brake-by-wire systems offer greater flexibility for driver positioning and prepares fleets for future innovations in autonomy and advanced safety.

85.    The article concludes, "[t]his is exactly what the delivery market needs if it's going to move to electrification: something that works with equipment that's already in place: loading docks, racks and other interior van organizing systems, has driver and operator familiarity, and so on."

86.    The information confirmed Canoo's suspicions.  Harbinger had copied Canoo's Step-Van Program and its Skateboard Technology, and rather than assign the associated intellectual property to Canoo as required, Eberts, Weicker, Charbonneau stole it for Harbinger to use.

/ / /

**C3.** **The Investor Defendants Knew that Harbinger Had Misappropriated Canoo's Trade Secrets and Confidential Information.**

87.    Harbinger would not be where it is today without the Investor Defendants, as they provided most (if not all) of Harbinger's early financial support.

88.    Weicker, Eberts and Harris—armed with Canoo's Trade Secrets and validated Step-Van Program—sold the idea of a "ready-made EV" company to early investors, including the Investor Defendants.

89.    The Investor Defendants each have significant investment experience, market knowledge, and financial resources.[9]   As sophisticated investors, they regularly conduct thorough due diligence before investing in any business opportunity, including investigations that reasonable investors are expected to undertake.  Indeed, proper (and thorough) due diligence is the cornerstone of any substantial investment transaction.

90.    The Investor Defendants did not blindly invest approximately **$28 million** (collectively) in Harbinger.  As sophisticated investors, they first conducted thorough due diligence in both Harbinger (and its founders) and Harbinger's business assets (or lack thereof), including intellectual property due diligence to analyze all aspects of Harbinger's technology.

91.    Any reasonable due diligence by the Investor Defendants would have shown the following:

---

[9] Tiger Global states on its website that it has "invested in **hundreds of companies** across more than 30 countries." *See https://www.tigerglobal.com/*.  Ironspring is a technology-focused investment firm that takes a "[d]isciplined investment decision-making" approach. *See https://ironspring.com/team/*.   Overture has "personally founded technology startups with over $1 billion in cumulative exits." *See https://www.overture.eco/*.  Schematic is an early-stage venture capital fund focused on investments in technology-based manufacturing companies that markets investments in at least 18 separate companies. *See https://www.schematicventures.com/*.

a.   *First*, Harbinger's founders (with the exception of Harris) were former high level lead engineers and designers at Canoo.

b.   *Second*, Harbinger's founders (with the exception of Harris) each executed a confidentiality agreement and invention assignment agreement with Canoo.  Indeed, the Investor Defendants (by virtue of their substantial experience with prior investments) knew that such confidentiality agreements and invention assignment agreements are commonplace in technology-focused industries like EV where intellectual property protections *are* the investment-backed product.

c.   *Third*, Harbinger (a start-up company) had developed intricate EV technology at an implausibly fast speed (technology that took Canoo years and hundreds of millions of dollars to develop).  Indeed, Harbinger was formed (at most) only **10 months** before the Investor Defendants invested in Harbinger.

d.   *Fourth,* in connection with any business plan, the Investor Defendants knew Harbinger's founders (with the exception of Harris) would perform the same lead engineering and design roles at Harbinger as they previously held with Canoo; meaning Harbinger's founders (with the exception of Harris) were picking up at Harbinger exactly where they left off with Canoo.

e.   *Fifth*, in connection with any business plan, the Investor Defendants knew that Harbinger planned to poach Canoo's key technical employees, supply chain managers, and salespeople.  Indeed, by December 2021, all of the Investor Defendants had invested in Harbinger, and Harbinger had already poached at least **6 employees from Canoo**.  Harbinger's plan to continue doing so made their investment even more attractive, as the technical

knowledge these employees brought to Harbinger enabled Harbinger to bypass the significant time and expense necessary to develop and expand its own EV technology.

f.    *Sixth*, only 10 months into its formation, Harbinger was valued at $75 million (with minimal, if any, capital investment).    On information and belief, this valuation was based entirely on Canoo's Skateboard Technology, Step-Van Program, and its employee capital.

92.    Having known this information, the Investor Defendants provided Harbinger with the funds necessary - **$28 million** - to take the design and engineering teams from Canoo—along with all the intangible assets that each of those team members learned and developed at Canoo—over to Harbinger.  These investment funds were then used for  "Development" as the associated "Research" was already funded and completed by Canoo.

93.    To solicit investments from the Investor Defendants, Canoo believes Weicker, Eberts and Harris provided the Step-Van Program to the Investor Defendants as a validated business model, which included all of the market data information collected by Canoo's consulting firm to vet its Step-Van Program (that Canoo paid tens of millions of dollars for).

94.    On information and belief, the Investor Defendants acquired Canoo's Step-Van Program and, by extension, Canoo's Trade Secrets associated with the Step-Van Program, including Canoo's **Customer Information, Market Information**, **Intellectual Property Protection Strategies and Programs,** and **Business Information**.

95.    Indeed, the Investor Defendants are not merely passive investors in Harbinger.  On information and belief, the Investor Defendants provided Harbinger with the bulk (if not all) of its early financial support—monies that directly facilitated and induced Harbinger's use of Canoo's Trade Secrets and confidential information

through product development.  As some of Harbinger's largest shareholders, the Investor Defendants are an influential block of shareholders in Harbinger that (on information and belief) exercise great influence and control over Harbinger.

**4.**    **Thor Industries, like the Investor Defendants, Turned a Blind Eye to Harbinger's Misconduct, Announcing a Partnership that Enabled Harbinger to Continue Using Canoo's Trade Secrets.**

96.    Thor Industries, the leading manufacturer of recreational vehicles ("RVs") in the United States, saw an opportunity to expand its business line by offering fully-electric RVs.  On information and belief, Thor considered various strategic partners, including Canoo.

97.    In November 2021, Thor's senior executives toured Canoo's facilities in Torrance, California, viewing first-hand Canoo's manufacturing processes and publicly-available details about Canoo's motor, powertrain, skateboard platform, and battery capabilities.  While Thor was not provided with Canoo's Trade Secrets during the tour, Thor was given the opportunity to see Canoo's near-finished product.

98.    After the tour, Canoo believes that Thor vetted other strategic partners to electrify its RVs, including Harbinger.

99.    In November 2022, Thor announced a strategic partnership with Harbinger, stating in a press release exactly why it chose Harbinger: "Harbinger's **proprietary technology** and **their focus on medium-duty solutions** makes them a great partner for THOR."[10]

100.    As a global leader in manufacturing RVs, one would expect Thor to seek established players in the EV space, yet Thor selected Harbinger—a start-up company in the highly competitive EV sector.

---

[10]https://www.prnewswire.com/news-releases/thor-industries-partners-with-harbinger-motors-to-accelerate-electrification-of-rv-consumer-experience-301666930.html.

101.   Like the Investor Defendants, Thor did not blindly enter a partnership with Harbinger without conducting some minimum level of due diligence.  Thor selected Harbinger as a strategic partner, despite the inherent risks of partnering with a start-up, because Thor knew (i) Harbinger was founded by former executives at Canoo, (ii) Harbinger had poached at least 34 of Canoo's employees, and (iii) Harbinger could offer a similar EV product at reduced costs because Harbinger had enjoyed a shortcut to success—i.e., "development" without the necessary "research." Indeed, having previously toured Canoo's facilities, Thor was well aware of the implausibility that a start-up company like Harbinger could *independently* develop intricate EV technology in such a short period that is functionally similar to Canoo's.

102.   Canoo believes that as part of the joint venture with Harbinger, Thor provided Harbinger with substantial funding that facilitated Harbinger's use (i.e., misappropriation) of Canoo's Trade Secrets and confidential information through product development in **collaboration with Thor**. By virtue of the strategic partnership with Harbinger, Thor **acquired** and/or **used** Canoo's Trade Secrets with full knowledge that Harbinger had acquired Canoo's Trade Secrets through improper means.

103.   In sum, Harbinger has leveraged intellectual property misappropriated from Canoo—including its Trade Secrets, Skateboard Technology, Step-Van Program, and other confidential information—to usurp business opportunities available to Canoo.

### FIRST CAUSE OF ACTION
**Misappropriation Of Trade Secrets in Violation
of the Defend Trade Secrets Act, 18 U.S.C. § 1836,** *et seq*.
**(Against All Defendants)**

104.   Canoo incorporates and realleges the allegations set forth above as if fully set forth herein.

105.   Canoo owns trade secret information that enjoys protection under the Defend Trade Secret Act, categorized above as Employee Information, Skateboard

Technology Information, Customer Information, Vendor Information, Market Information, Business Information, Investor Information, Sales Information, Product Information, and Negative Information.

106.  As discussed above, Canoo's Trade Secrets are valuable and derive independent economic value because they are not generally known or readily accessible through proper means to others, who could profit from use of Canoo's Trade Secrets.

107.  As discussed above, Canoo has taken more than adequate measures to maintain the secrecy of this information.

108.  Accordingly, the above-described information constitutes a "trade secret" under the Defend Trade Secrets Act, 18 U.S.C. § 1836.

109.  Canoo is informed and believes, and on that basis alleges, that Defendants misappropriated Canoo's Trade Secrets as follows:

      a.    The Harbinger Defendants **acquired** Canoo's Trade Secrets with full knowledge that the information was subject to the non-disclosure provision in the Confidentiality Agreements and Separation Contracts with Canoo.

      b.    The Harbinger Defendants **disclosed** Canoo's Trade Secrets to other persons, including the Investor Defendants and Thor, without Canoo's knowledge or consent.

      c.    The Harbinger Defendants **used** Canoo's Trade Secrets in connection with their own competing business activities, including in the development of Harbinger's EV technology and business plans.

      d.    The Investor Defendants **acquired** Canoo's Trade Secrets with full knowledge (via due diligence) that the information was subject to the non-disclosure provision in the Confidentiality Agreements and Separation Contracts with Canoo.

e.    The Investor Defendants invested in Harbinger and (as shareholders in Harbinger) exercise (or have the ability to exercise) some degree of control over Harbinger; and the Investor Defendants knew or had reason to know that the Harbinger Defendants had improperly **acquired** and were **using** Canoo's Trade Secrets to compete with Canoo.

f.    Thor has **acquired** and/or is using Canoo's Trade Secrets in connection with its strategic partnership with Harbinger, including the development of a driving platform for Thor's RVs that is based on Canoo's Trade Secrets. Thor knew (via due diligence) that the information was subject to the non-disclosure provision in the Confidentiality Agreements and Separation Contracts with Canoo.

110.    Defendants' foregoing conduct constitutes an actual and/or threatened misappropriation and misuse of Canoo's Trade Secrets in violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836.

111.    As a direct and proximate cause of Defendants' actions as alleged above, Canoo has suffered, and will continue to suffer, actual damages, including loss of capital, loss of valuable business, loss of profits, and loss of goodwill, in an amount to be proven at trial.

112.    As a further proximate result of the misappropriation, Canoo is informed and believes, and on that basis alleges, that Defendants have been unjustly enriched in an amount to be proven at trial.

113.    Canoo is informed and believes, and on that basis alleges, that Defendants' conduct was, and is, malicious, fraudulent, deliberate, and/or willful. Canoo is therefore entitled to recover from Defendants, exemplary damages as permitted by 18 U.S.C. § 1836(b)(3)(C).

114.    Canoo also seeks an award of attorneys' fees (trial and appellate) pursuant to 18 U.S.C. § 1836(b)(3)(D).

## SECOND CAUSE OF ACTION
### Misappropriation Of Trade Secrets in Violation of the California Uniform Trade Secrets Act, Cal. Civ. Code. § 3426.1
### (Against All Defendants)

115.   Canoo incorporates and realleges the allegations set forth above as if fully set forth herein.

116.   Canoo owns trade secret information that enjoys protection under the California Uniform Trade Secrets Act, categorized above as Employee Information, Skateboard Technology Information, Customer Information, Vendor Information, Market Information, Business Information, Investor Information, Sales Information, Product Information, and Negative Information.

117.   As discussed above, Canoo's Trade Secrets are valuable and derive independent economic value because they are not generally known or readily accessible through proper means to others, who could profit from use of Canoo's Trade Secrets.

118.   As discussed above, Canoo has taken more than adequate measures to maintain the secrecy of this information.

119.   Accordingly, the above-described information constitutes a "trade secret" under the California Uniform Trade Secrets Act. See California Civil Code § 3426, *et seq*.

120.   Defendants misappropriated Canoo's Trade Secrets:

a.   The Harbinger Defendants **acquired** Canoo's Trade Secrets with full knowledge that the information was subject to the non-disclosure provision in the Confidentiality Agreements and Separation Contracts with Canoo.

b.   The Harbinger Defendants **disclosed** Canoo's Trade Secrets to other persons, including the Investor Defendants and Thor, without Canoo's knowledge or consent.

c.    The Harbinger Defendants **used** Canoo's Trade Secrets in connection with their own competing business activities, including in the development of Harbinger's EV technology and business plans.

d.    The Investor Defendants **acquired** Canoo's Trade Secrets with full knowledge (via due diligence) that the information was subject to the non-disclosure provision in the Confidentiality Agreements and Separation Contracts with Canoo.

e.    The Investor Defendants invested in Harbinger and (as shareholders in Harbinger) exercise (or have the ability to exercise) some degree of control over Harbinger; and the Investor Defendants knew or had reason to know that the Harbinger Defendants had improperly **acquired** and were **using** Canoo's Trade Secrets to compete with Canoo.

f.    Thor has **acquired** and/or is using Canoo's Trade Secrets in connection with its strategic partnership with Harbinger, including the development of a driving platform for Thor's RVs that is based on Canoo's Trade Secrets.  Thor knew (via due diligence) that the information was subject to the non-disclosure provision in the Confidentiality Agreements and Separation Contracts with Canoo.

121.    Defendants' foregoing conduct constitutes an actual and/or threatened misappropriation and misuse of Canoo's Trade Secrets in violation of the California Uniform Trade Secrets Act.

122.    As a direct and proximate cause of Defendants' actions as alleged above, Canoo has suffered, and will continue to suffer, actual damages, including loss of capital, loss of valuable business, loss of profits, and loss of goodwill, in an amount to be proven at trial.

/ / /

123.   As a further proximate result of the misappropriation, Canoo is informed and believes, and on that basis alleges, that Defendants have been unjustly enriched in an amount to be proven at trial.

124.   Canoo is informed and believes, and on that basis alleges, that Defendants' conduct was, and is, malicious, fraudulent, deliberate, and/or willful. Canoo is therefore entitled to recover from Defendants, exemplary damages as permitted by California Civil Code § 3426.3.

125.   Canoo also seeks an award of attorneys' fees (trial and appellate) pursuant to California Civil Code §3426.4.

### THIRD CAUSE OF ACTION
**Breach of Contract: Confidentiality Agreement**
**(Against Eberts, Weicker, Fielkow, and Charbonneau)**

126.   Canoo incorporates and realleges the allegations set forth above as if fully set forth herein.

127.   As set forth above, the Former Canoo Executives executed the Confidentiality Agreement.

128.   The Confidentiality Agreement prohibits (among other things) the unauthorized use and/or disclosure of Canoo's Trade Secrets and "Confidential Information:"[11]

---

[11] The Confidentiality Agreement defines "Confidential Information" as "any and all confidential knowledge, data or information of [Canoo.  By way of illustration but not limitation, '***Confidential Information***' includes (a) trade secrets, inventions, mask words, ideas, processes, formulas, software in source or object code, data, programs, other works of authorship, know-how, improvements, discoveries, developments, designs and techniques and any other proprietary technology…(b) information regarding research, development, new products, marketing and selling, business plans, budgets and unpublished financial statements….(c) information regarding customers and potential customers of [Canoo], including customer lists, names, representatives, their needs or desires with respect to the types of products or services offered by [Canoo], proposals, bids, contracts and their contents and parties…(e) information regarding personnel, employee lists, compensation, and

> I understand and acknowledge that my employment by [Canoo] creates a relationship of confidence and trust with respect to [Canoo's] Confidential Information…and that [Canoo] has a protectable interest therein. At all times during and after my employment, I will hold in confidence and will not disclose, use, lecture upon, or publish any of [Canoo's] Confidential Information … I hereby assign to [Canoo] any rights I may have or acquire in such Confidential Information and recognize that all Confidential Information shall be the sole and exclusive property of [Canoo] and its assigns. I will take all reasonable precautions to prevent the inadvertent accidental disclosure of Confidential Information.

129.    The Confidentiality Agreement also includes the following invention assignment provision:

> I hereby assign to Company all my right, title, and interest in and to any and all Inventions (and all Intellectual Property Rights with respect thereto) made, conceived, reduced to practice, or learned by me, either alone or with others, during the period of my employment by Company.[12]

130.    Moreover, the Confidentiality Agreement prohibits the employee from "directly or indirectly, engag[ing] in any employment or business activity which is directly or indirectly competitive with, or would otherwise conflict with, [the employee's] employment by or obligations to [Canoo]."

131.    Finally, the Confidentiality Agreement includes a non-solicitation provision:

> I agree that during the period of my employment … I will not, as an officer, director, employee, consultant, owner, partner, or in any other capacity, either

---

employee skills; and (f) any other non-public information which a competitor of [Canoo] could use to the competitive disadvantage of [Canoo]."

[12] The Confidentiality Agreement defines (i) "Inventions" as "trade secrets, inventions, mask works, ideas, processes, formulas, software in source or object code, data, programs, other works of authorship, know-how, improvements, discoveries, developments, designs and techniques and any other proprietary technology and Intellectual Property Rights…" and (ii) "Intellectual Property Rights" as "all trade secret, Copyrights, trademarks, mask work rights, patents and other intellectual property rights recognized by the laws of any jurisdiction or country."

directly or through others, except on behalf of [Canoo], solicit, induce, encourage, or participate in soliciting, inducing or encouraging any person known to me to be an employee, consultant, or independent contractor of [Canoo] to terminate his or her relationship with [Canoo], even if I did not initiate the discussion or seek out the contact.

132.   The Confidentiality Agreement constitutes an enforceable contract between each of the Former Canoo Executives and Canoo.  As with every contract, the Confidentiality Agreement contains an implied covenant of good faith and fair dealing that requires the Former Canoo Executives to refrain from doing anything that would injure Canoo's right to receive the benefits of the Confidentiality Agreement.

133.   Canoo has performed all of its covenants and/or conditions under the Confidentiality Agreement, except to the extent that such performance has been prevented, excused, hindered, or waived by the Former Canoo Executives.

134.   The Former Canoo Executives materially breached the Confidentiality Agreement based on their conduct described herein by, among other things, (a) taking, disclosing, transferring, removing, misusing, and/or misappropriating Canoo's Trade Secrets and confidential information; (b) accepting employment with Harbinger with the purpose or intent of disclosing Canoo's Trade Secrets and confidential information; (c) while employed by Canoo, soliciting, recruiting, or inducing Canoo's employees to leave Canoo and join Harbinger for the purpose of further acquiring Canoo's Trade Secrets and confidential information; and (d) failing to assign to Canoo, all inventions, improvements, and associated intellectual property that they developed and/or invented while employed at Canoo—as the Former Canoo Executives appear to claim ownership of certain intellectual property that they developed and/or created while at Canoo.

135.   Indeed, Harbinger's entire product platform is based on Canoo's Trade Secrets, confidential information, Step-Van Program, Skateboard Technology, and

developments and inventions made by Weicker, Eberts, and Charbonneau that should have been assigned to Canoo pursuant to the Confidentiality Agreement.

136.  As a direct and proximate result of the Former Canoo Executives' material breaches of the Confidentiality Agreement, Canoo has sustained general, special, consequential, and incidental damages in an amount to be proven at trial.

137.  Moreover, pursuant to the specific terms of the Confidentiality Agreement, Canoo is entitled to a Court order, directing the Harbinger Defendants to assign all of their intellectual property, including its EV technology, which was developed by the Former Canoo Executives while employed at Canoo.

## FOURTH CAUSE OF ACTION
### Breach of Contract: Separation Contract
### (Against Eberts, Weicker, Fielkow, and Charbonneau)

138.  Canoo incorporates and realleges the allegations set forth above as if fully set forth herein.

139.  Upon departure from Canoo, Canoo requires each employee (including Eberts, Weicker, Fielkow, and Charbonneau) to execute an Employee Separation Information Letter (the "Separation Letter") and/or Separation Agreement and Release ("Separation Agreement") (together, both are referred to as the "Separation Contract").

140.  The Separation Letter:

   a.  Prohibits the employee "from emailing any Canoo documents or information to a personal email account [and to the extent] you have previously emailed any Canoo documents to a personal email account or if you have ever conducted Canoo business through a personal email account, you must immediately delete any such documents or emails and send written confirmation of the deletion to Canoo."

   b.  Requires the employees to return all of Canoo's equipment and documents: "Upon your final date of employment…you will be

required to return all Canoo equipment, documents, and other Company-related information in your possession."

c.    Requires the employee to observe and abide by the terms of the Confidentiality Agreement, including an obligation "to keep all [Confidential Information] confidential and to not use it to the detriment of [Canoo].  In particular, you may not use it for, or disclose it to, any third party, including any new employer or competitor of [Canoo]."

141.    In the Separation Contract, the employee commits to the following:

a.    "Employee reaffirms and agrees to observe and abide by the terms of the Confidentiality Agreement, specifically including the provisions therein regarding nondisclosure of [Canoo's] trade secrets and confidential and proprietary information…"

b.    "Employee acknowledges that during the course of Employee's employment with [Canoo] Employee had access to a number of highly confidential materials and Employee specifically represents that Employee shall refrain from using any such confidential information in the future. Employee affirms that Employee has returned all documents and other items provided to Employee by [Canoo], developed or obtained by Employee in connection with Employee's employment with [Canoo], or otherwise belonging to [Canoo]."

c.    "Employee affirms that he has honored and will honor his duty of the loyalty to [Canoo] until his separation from [Canoo]. Employee has acted and will act in the best interests of [Canoo] until his separation from [Canoo], including by providing all opportunities to [Canoo] and not delaying or deferring those opportunities."

d.    "[W]hile employed by [Canoo], has not and will not encourage other employees, customers, clients, or vendors of [Canoo] to negatively alter their relationship with [Canoo], including by transferring their employment or business to any competitor of [Canoo]."

142.    The Separation Contract constitutes an enforceable contract between each of the Former Canoo Executives and Canoo.  As with every contract, the Separation Contract contains an implied covenant of good faith and fair dealing that requires the Former Canoo Executives to refrain from doing anything that would injure Canoo's right to receive the benefits of the Separation Contract.

143.    Canoo has performed all of its covenants and/or conditions in the Separation Contract, except to the extent that such performance has been prevented, excused, hindered, or waived by the Former Canoo Executives.

144.    The Former Canoo Executives materially breached the Separation Contract based on the conduct described above by, among other things, (a) taking, disclosing, transferring, removing, misusing, and/or misappropriating Canoo's Trade Secrets and confidential information; (b) accepting employment with Harbinger with the purpose or intent of disclosing Canoo's Trade Secrets and confidential information; (c) soliciting, recruiting, or inducing Canoo's employees to leave Canoo and join Harbinger for the purpose of further acquiring Canoo's Trade Secrets and confidential information; and (d) Weicker, Eberts, and Charbonneau failed to assign to Canoo, all inventions, improvements, and associated intellectual property that they developed and/or invented while employed at Canoo.

145.    Indeed, Harbinger's entire product platform is based on Canoo's Trade Secrets, confidential information, Step-Van Program, Skateboard Technology, and developments and inventions made by Weicker, Eberts, and Charbonneau that should have been assigned to Canoo pursuant to the Confidentiality Agreement.

/ / /

146.   As a direct and proximate result of the Former Canoo Executives' material breaches of the Separation Contract, Canoo has sustained general, special, consequential, and incidental damages in an amount to be proven at trial.

## FIFTH CAUSE OF ACTION
### Intentional Interference with Contractual Relations
### (Against Harbinger, Electron, Overture, Schematic, Ridgeline, Moses, Ironspring, Tiger Global, and Bharat Forge)

147.   Canoo incorporates and realleges the allegations set forth above as if fully set forth herein.

148.   The Former Canoo Employees entered into the Confidentiality Agreement and the Separation Contract with Canoo (together, the "Employment Contracts").

149.   Harbinger and Electron knew that the Former Canoo Employees had Employment Contracts with Canoo, as Weicker, Eberts, Charbonneau, and Fielkow themselves signed such agreements with Canoo and knew such agreements were required of all Canoo employees.

150.   The Investor Defendants knew that the Former Canoo Employees had Employment Contracts with Canoo, as sophisticated investment firms (like the Investor Defendants) know that confidentiality agreements and invention assignment agreements (like Canoo has with its employees) are commonplace in technology-focused industries like EV where intellectual property protections *are* the investment-backed product.

151.   On information and belief, the Investor Defendants provided Harbinger with the funds necessary to continue soliciting Canoo's employees in order to obtain Canoo's confidential information and Trade Secrets. That is what partially made their investment more attractive, as the confidential information and Trade Secrets misappropriated by the Former Canoo Employees enabled Harbinger bypass the

significant time and expense necessary to develop and expand its own EV technology.[13]

152. The conduct of Harbinger, Electron, and the Investor Defendants prevented performance (or made performance more difficult) of the Employment Agreements by, among other things:

   a. Encouraging the Former Canoo Employees to disclose Canoo's Trade Secrets and other confidential information, fully aware that these individuals were contractually barred from doing so under the Employment Agreements.

   b. Encouraging the Former Canoo Employees to not assign to Canoo, all work product that they invented or developed while employed at Canoo, fully aware that these individuals were contractually required to do so under the Confidentiality Agreement.

   c. Encouraging the Former Canoo Employees to not return all of Canoo's "Confidential Information" (as defined in the Confidentiality Agreement) upon their departure from Canoo.

153. Canoo is informed and believes, and on that basis alleges, that Harbinger, Electron and the Investor Defendants intended to disrupt performance of the Employment Agreements, or knew that such disruption was certain, or substantially certain, to occur.

154. Harbinger, Electron, and the Investor Defendants willfully and intentionally interfered with these agreements, without privilege to do so, by aiding,

---

[13] Indeed, many of the Former Canoo Employees are pursuing intellectual property protection for trade secrets, patentable inventions, original works of authorship, trade dress, and designs that Canoo believes belong to (or are based upon) Canoo's trade secrets and confidential and proprietary information. Pursuant to Canoo's Confidentiality Agreements and Separation Contracts with these employees, Canoo is the rightful owner of these misappropriated intellectual property assets.

abetting, encouraging and/or assisting the Former Canoo Employees in breaching their contractual obligations to Canoo.

155.   The conduct of Harbinger, Electron and the Investor Defendants have harmed Canoo by depriving Canoo of the benefits of the Employment Agreements.

156.   The conduct of Harbinger, Electron and the Investor Defendants was a substantial factor in causing Canoo's harm.  Canoo has sustained general, special, consequential, and incidental damages in an amount to be proven at trial.

157.   Canoo is informed and believes, and on that basis alleges, that Harbinger, Electron and the Investor Defendants acted with oppression, fraud, and malice, with the intent to injure and damage Canoo, entitling Canoo to an award of punitive damages against Harbinger, Electron and the Investor Defendants in an amount according to proof at trial and sufficient to punish and to deter Harbinger, Electron and the Investor Defendants from engaging in this conduct in the future.

## SIXTH CAUSE OF ACTION
### Negligent Interference with Prospective Economic Advantage
### (Against Harbinger, Electron, Overture, Schematic, Ridgeline, Moses, Ironspring, Tiger Global, and Bharat Forge)

158.   Canoo incorporates and realleges the allegations set forth above as if fully set forth herein.

159.   An economic relationship existed between Canoo and the Former Canoo Employees.

160.   Based upon the significant financial capital and human resources exerted in developing its Skateboard Technology and Step-Van Program, Canoo had a viable expectation of receiving continued benefits of its relationship with the Former Canoo Employees, as those employees would have otherwise continued developing and improving Canoo's EV technology for the Step-Van Program and could have expanded Canoo's intellectual property portfolio.

161.   Based upon the significant financial capital and human resources exerted in developing its Skateboard Technology and Step-Van Program, Canoo had

a viable expectation of receiving continued benefits of the Employment Contracts as some of the duties (including the obligation to assign inventions and maintain the confidentiality of Canoo's Trade Secrets ) were to survive the Former Canoo Employees' employment with Canoo.

162.    There was a probability of future economic benefit to Canoo from the business relations between Canoo and the Former Canoo Employees.

163.    Harbinger, Electron and the Investor Defendants knew or should have known of Canoo's economic relationship with the Former Canoo Employees.

164.    Harbinger, Electron and the Investor Defendants failed to act with reasonable care.

165.    Canoo is informed and believes, and on that basis alleges, that by engaging in the conduct discussed hereinabove, Harbinger, Electron and the Investor Defendants disrupted the relationship between Canoo and the Former Canoo Employees.

166.    There was an actual disruption in the relationship between Canoo and the Former Canoo Employees.

167.    Canoo was substantially harmed by the conduct of Harbinger, Electron and the Investor Defendants.

168.    As a proximate result of the conduct of Harbinger, Electron and the Investor Defendants, Canoo suffered substantial damages, including special damages, in the form of lost earnings, benefits and/or out of pocket expenses in an amount to be proven at trial.

169.    As a further direct and proximate result of the conduct of Harbinger, Electron and the Investor Defendants, Canoo will continue to suffer additional damages including special damages in the form of lost future earnings, benefits and/or other prospective damages in an amount to be proven at trial.

/ / /

/ / /

### SEVENTH CAUSE OF ACTION
**Breach of Fiduciary Duty**
**(Against Weicker, Fielkow and Charbonneau)**

170.   Canoo incorporates and realleges the allegations set forth above as if fully set forth herein.

171.   Weicker, Fielkow, and Charbonneau were high-level executives at Canoo.  As such, they owed Canoo fiduciary duties, including, without limitation, duties of care and undivided loyalty.

172.   Canoo is informed and believe, and on that basis allege, that Weicker, Fielkow, and Charbonneau breached their fiduciary duties to Canoo (and/or knowingly aided and abetted, substantially assisted, and encouraged each of the other Former Canoo Employees to do so) by engaging in the following acts and omissions, among others:

      a.    While employed by Canoo, competing with Canoo through the formation and operation of Harbinger and/or Electron;

      b.    While employed by Canoo, soliciting employees to leave Canoo and join Harbinger;

      c.    While employed by Canoo, working for and acting as officers of Harbinger (as to Fielkow and Charbonneau);

      d.    While employed by Canoo, disrupting modifications to Canoo's Skateboard Technology necessary to adapt the technology for delivery vans; and

      e.    While employed by Canoo, diverting or attempting to divert Canoo's potential partners and joint venturers such as Thor and MO to Harbinger.

      f.    While employed by Canoo, sabotaging Canoo's Step-Van Program.

173.   Moreover, Fielkow (as counsel to Canoo) owed a non-waivable fiduciary duty to Canoo.  As described above, Fielkow breached both his fiduciary

and ethical duties to Canoo by (i) disclosing to Harbinger, Canoo's Trade Secrets and confidential information; (ii) misrepresenting to Canoo that he would not join a competitor; and (iii) disclosing to Harbinger (while still employed at Canoo) Canoo's patent counsel. Fielkow did not seek and Canoo did not waive any conflict of interest as to Fielkow's employment with Harbinger.

174. Canoo did not give informed consent to Eberts, Weicker, Fielkow, or Charbonneau to breach their fiduciary duties.

175. Canoo is informed and believes, and on that basis alleges, that as a direct, foreseeable, and proximate result of the fiduciary breaches described herein, Canoo has been damaged in an amount presently unknown, but to be proven at trial.

176. Canoo is informed and believes, and on that basis alleges, that Weicker, Fielkow, and Charbonneau acted willfully, maliciously, and oppressively with full knowledge of the adverse effect of their actions and/or with willful and deliberate disregard of the consequences sufficient to constitute oppression, fraud or malice. By reason thereof, Canoo is entitled to recover punitive and exemplary damages from Weicker, Fielkow, and Charbonneau in an amount to be proven at trial and sufficient to punish (and/or deter) them from engaging in such conduct in the future.

### EIGHTH CAUSE OF ACTION
#### Aiding & Abetting Breach of Fiduciary Duty
#### (Against Harbinger, Eberts, Harris and Dusastre)

177. Canoo incorporates and realleges the allegations set forth above as if fully set forth herein.

178. At all times alleged herein, Harbinger, Eberts, Harris and Dusastre knew (or should have known) that Weicker, Fielkow, and Charbonneau each owed fiduciary duties to Canoo.

179. As discussed above, Weicker, Fielkow, and Charbonneau breached their fiduciary duties to Canoo.

180. At all times alleged herein, Harbinger, Eberts, Harris and Dusastre were aware of the conduct of Weicker, Fielkow, and Charbonneau as alleged herein,

1   including their breaches of their fiduciary duties owed to Canoo.

2   181.   Harbinger, Eberts, Harris and Dusastre gave substantial assistance or

3   encouragement to Weicker, Fielkow, and Charbonneau to breach their fiduciary

4   duties.

5   182.   The conduct of Harbinger, Eberts, Harris and Dusastre was a substantial

6   factor in causing harm to Canoo.  Canoo is informed and believes, and on that basis

7   alleges, that as a direct, foreseeable, and proximate result of such conduct, Canoo has

8   been damaged in an amount presently unknown, but to be proven at trial.

9   183.   Canoo is informed and believes, and on that basis alleges, that

10  Harbinger, Eberts, Harris and Dusastre acted willfully, maliciously, and oppressively

11  with full knowledge of the adverse effect of their actions and/or with willful and

12  deliberate disregard of the consequences sufficient to constitute oppression, fraud or

13  malice.  By reason thereof, Canoo is entitled to recover punitive and exemplary

14  damages from Harbinger, Eberts, Harris and Dusastre in an amount to be proven at

15  trial and sufficient to punish (and/or deter) them from engaging in such conduct in

16  the future.

17  **NINTH CAUSE OF ACTION**
    **Breach of Duty of Loyalty**
18  (**Against Eberts, Weicker, Fielkow, and Charbonneau**)

19  184.   Canoo incorporates and realleges the allegations set forth above as if

20  fully set forth herein.

21  185.   While employed at Canoo, the Former Canoo Executives owed Canoo

22  a duty of undivided loyalty to (i) place Canoo's interests above their own, (ii) refrain

23  from competing with Canoo, and (iii) act for Canoo's benefit in all matters connected

24  with their contractual and employment relationship with Canoo.  The Former Canoo

25  Executives owed such duties by virtue of their employment relationship with Canoo

26  and by the special confidence reposed in them by Canoo in connection with their

27  exposure and access to Canoo's trade secrets and Confidential Information.

28  / / /

186.    While employed at Canoo, the Former Canoo Executives owed Canoo multiple statutory duties of care, including duties to: (i) "use ordinary care and diligence" in the performance of their duties (Cal. Labor Code § 2854); (ii) "substantially comply with all the directions of" the Company (Id. § 2856); (iii) "exercise a reasonable degree of skill" in the performance of their duties (Id. § 2858); and (iv) "use such skill as [they] possess[], so far as the same is required" (Id. § 2859).

187.    The Former Canoo Executives breached their duty of loyalty to Canoo (and/or knowingly aided and abetted, substantially assisted, and/or encouraged each of the other Former Canoo Executives in breaching their duty of loyalty of care) by among engaging in the following conduct while employed by the Canoo:

    a.    Competing with the Canoo;

    b.    Acting in such manner as to sabotage Canoo's operations;

    c.    Interfering with and attempting to sabotage Canoo's relationships with its investors, customers, and suppliers;

    d.    Interfering with and sabotaging Canoo's relationships with potential partners, like MO and Thor; and

    e.    Soliciting employees to leave Canoo and join Harbinger.

188.    Further, as the Former Canoo Executives' actions and/or inactions constitute culpable misconduct, the Former Canoo Executives are "liable to [Canoo] for the damage thereby caused" pursuant to California Labor Code Section 2865.

189.    Canoo did not give informed consent to the Former Canoo Executives' misconduct.

190.    Canoo is informed and believes, and on that basis alleges, that as a direct, foreseeable, and proximate result of the Former Canoo Executives' breach of the duties of loyalty and care described herein, Canoo has been damaged in an amount presently unknown, but to be proven at trial.

/ / /

/ / /

## TENTH CAUSE OF ACTION
### Aiding & Abetting Breach of Duty of Loyalty
### (Against Harbinger, Harris and Dusastre)

191.   Canoo incorporates and realleges the allegations set forth above as if fully set forth herein.

192.   At all times alleged herein, Harbinger, Harris, and Dusastre knew that each of the Former Canoo Executives owed Canoo a duty of loyalty.

193.   As discussed hereinabove, each of the Former Canoo Executives breached their duty of loyalty to Canoo.

194.   At all times alleged herein, Harbinger, Harris, and Dusastre were aware of the wrongful conduct of the Former Canoo Executives as alleged above, including their breach of the duty of loyalty.

195.   Harbinger, Harris, and Dusastre gave substantial assistance and/or encouragement to the Former Canoo Executives to breach their duty of loyalty.

196.   The conduct of Harbinger, Harris, and Dusastre caused (and/or was a substantial factor in causing) Canoo harm.  As a direct, foreseeable, and proximate result of such conduct, Canoo has been damaged in an amount to be proven at trial.

197.   Canoo is informed and believes, and on that basis alleges, that Harbinger, Harris, and Dusastre acted with oppression, fraud, and malice, and with the intent to injure and damage Canoo, entitling Canoo to an award of punitive damages against Harbinger, Harris, and Dusastre in an amount according to proof at trial and sufficient to punish and/or deter them from engaging in this conduct in the future.

## ELEVENTH CAUSE OF ACTION
### Fraud in the Inducement as to the Confidentiality Agreement
### (Against Eberts, Weicker, and Charbonneau)

198.   Canoo incorporates and realleges the allegations set forth above as if fully set forth herein.

199.   Canoo believes that Harris, Eberts, Weicker, and Charbonneau always intended to own and control their own EV company.  Thus, if Eberts, Weicker and

Charbonneau were to leave Canoo for whatever reason to start a new EV company, they always planned to take with them Canoo's Trade Secrets and confidential information and all the inventions that they developed while at Canoo. For that reason, when Eberts, Weicker, and Charbonneau executed the Confidentiality Agreement, they never had any intention of complying with its terms.

200. When Eberts, Weicker, and Charbonneau signed the Confidentiality Agreement, they knew their representations and promises in that agreement were false, including that (i) "I will hold in confidence and not disclose, use, lecture upon, or publish any of [Canoo's] Confidential Information;" (ii) "I hereby assign to [Canoo] any rights I may have or acquire in such Confidential Information and recognize that all Confidential Information shall be the sole and exclusive property of [Canoo];" (iii) "I hereby assign to [Canoo] all my right, title, and interest in and to any and all Inventions (and all Intellectual Property rights with respect thereto) made, conceived, reduced to practice, or learned by me…during the period of my employment by [Canoo];" (iv) "I agree that [Canoo] will exclusively own all work product that is made by me…within the scope of my employment, and I hereby irrevocably and unconditionally assign to [Canoo] all right, title and interest worldwide in and to such work product;" and (v) "I agree that during the period of my employment by [Canoo], I will not … directly or indirectly engage in any employment or business activity which is directly or indirectly competitive with, or would otherwise conflict with, my employment by [Canoo]."

201. Canoo is informed and believes, and on that basis alleges, that Weicker, Eberts, and Charbonneau made these material misrepresentations with the intent to defraud Canoo and induce Canoo to execute the Confidentiality Agreement.

202. Canoo was ignorant of the true facts when Weicker, Eberts, and Charbonneau made the material misrepresentations described above.

203. Canoo relied on these misrepresentations by executing the Confidentiality Agreement and thereafter providing Weicker, Eberts, and

Charbonneau with access to Canoo's Trade Secrets and confidential information.

204.   Canoo's reliance was reasonable given that Weicker, Eberts, and Charbonneau each stated their intent to comply with the Confidentiality Agreement.

205.   As a direct and proximate result of the foregoing concealment, misrepresentations, and fraud, Canoo has suffered damages in an amount to be proven at trial.

206.   Canoo is informed and believes, and on that basis alleges, that Weicker, Eberts, and Charbonneau acted with oppression, fraud, and malice, and with the intent to injure and damage Canoo, entitling Canoo to an award of punitive damages against Weicker, Eberts, and Charbonneau in an amount according to proof at trial and sufficient to punish (and/or deter) them from engaging in this conduct in the future.

## TWELFTH CAUSE OF ACTION
### Fraud in the Inducement as to the Separation Contract
### (Against Eberts, Weicker, Fielkow, and Charbonneau)

207.   Canoo incorporates and realleges the allegations set forth the above as if fully set forth herein.

208.   As discussed above, the Former Canoo Executives conspired together at Canoo to create Harbinger using Canoo's Trade Secrets, confidential information, and human capital.  Thus, when the Former Canoo Employee departed Canoo to join Harbinger and executed the Separation Contract, they never had any intention of complying with its terms.

209.   When the Former Canoo Executives signed the Separation Contract, they knew their representations and promises in that agreement were false, including their representation that they would not use and/or disclose any of Canoo's Trade Secrets and confidential information after leaving Canoo.

210.   The Former Canoo Executives never intended to comply with these promises when they signed the Separation Contract.

/ / /

211.   When the Former Canoo Employee departed Canoo to join Harbinger, each intended to (and did) take Canoo's Trade Secrets and confidential information—contrary to their explicit promises in the Separation Contract.

212.   The Former Canoo Executives knew that their material misrepresentations in the Separation Contract were false and were made with the intent to deceive and defraud Canoo.

213.   Moreover, the Former Canoo Executives concealed material facts from Canoo, including that they intended to join Harbinger, intended to share Canoo's Trade Secrets and confidential information with Harbinger, and never intended to assign to Canoo all inventions and improvements developed by them while at Canoo. As Canoo's high level Executives, the Former Canoo Executives had a duty to disclose these material facts to Canoo.

214.   Canoo was ignorant of the true facts when the Former Canoo Executives made the foregoing material misrepresentations and concealments.

215.   Canoo is informed and believes, and on that basis alleges, that the Former Canoo Executives concealed these material facts and made these material misrepresentations with the intent to induce Canoo to take actions detrimental to Canoo's interests.

216.   Canoo relied on the Former Canoo Executives' concealments and misrepresentations related to the Separation Contract to its detriment.  Had Canoo known about these concealments and misrepresentations in real time, it could have sought protection (like an injunction) against further intellectual property theft at an earlier time.  Instead, these concealments and misrepresentations allowed Harbinger to continue misappropriating Canoo's intellectual property unabated.

217.   Canoo's reliance was reasonable in light of the Former Canoo Executives' stated intent to comply with the Separation Contract.

/ / /

/ / /

218.  As a direct and proximate result of the Former Canoo Executives'
concealment, misrepresentations, improper conduct, and fraud alleged herein, Canoo
has suffered damages in an amount to be proven at trial.

219.  Canoo is informed and believes, and on that basis alleges, that the
Former Canoo Executives acted with oppression, fraud, and malice, and with the
intent to injure and damage Canoo, entitling Canoo to an award of punitive damages
against the Former Canoo Executives in an amount according to proof at trial and
sufficient punish (and/or deter) them from engaging in such misconduct in the future.

### THIRTEENTH CAUSE OF ACTION
**Unfair Competition [Cal. Business and Professions Code. § 17200 et seq.]**
**(Against All Defendants)**

220.  Canoo incorporates and realleges the allegations set forth above as if
fully set forth herein.

221.  This is a cause of action for unfair business practices arising under
California Business and Professions Code section 17200 *et seq*., which prohibits "any
unlawful, unfair or fraudulent business act or practice." *See* Cal. Bus. & Prof. Code
§17200.

222.  As alleged above, Defendants engaged in unlawful, unfair, and
fraudulent business practices:

    a.    **Unlawful business practices** include breaching the Confidentiality
Agreement by misappropriating Canoo's Trade Secrets and failing
to assign to Canoo, all inventions (and associated intellectual
property) that the Former Canoo Executives developed and/or
invented while employed at Canoo.

    b.    **Unfair business practices** include (i) soliciting Canoo's
employees to join Harbinger, fully aware that such employees had
Canoo's Trade Secrets and had signed Confidentiality Agreements
with Canoo; (ii) misrepresenting to the public that Harbinger has
developed "a foundation of proprietary, in-house developed vehicle

technologies designed specifically for commercial vehicles" when, in reality, the "technologies" were developed using intellectual property stolen from Canoo; and (iii) soliciting Canoo's vendors (and/or affiliates of such vendors) to partner with Harbinger.

c. **Fraudulent business practices** include (i) the Former Canoo Executives executing the Employment Contracts with no intention of complying with its terms, knowing that they may later need Canoo's Trade Secrets and confidential information to form a competing EV company; (ii) the Former Canoo Executives concealing their plan to steal Canoo's intellectual property (excluding the Trade Secrets but specifically including its confidential information) for their own economic benefit; and (iii) the Former Canoo Executives fraudulently representing that they would assign to Canoo, all inventions (and associated intellectual property) that they developed and/or invented while employed at Canoo.

223.  Canoo is informed and believes, and on that basis alleges, that in violation of California Business and Professions Code section 17200 et seq., Defendants improperly misappropriated, removed, retained, and/or began using Canoo's confidential information.

224.  Defendants' actions are part of a deliberate scheme and plan to deprive Canoo of the benefits of its own substantial investment and efforts and to steal the fruits of several years of its labor, and to give Defendants an unfair competitive advantage.

225.  Defendants have been unjustly enriched and Canoo has suffered irreparable harm as a result of Defendants' activities and will continue to suffer irreparable injury that cannot be adequately remedied at law unless Defendants,

including their agents and all other persons acting in concert with them, are enjoined from engaging in any further such acts.

226.   The substantial harm to Canoo outweighs the public benefit of Defendants' conduct.

227.   Canoo is entitled to injunctive relief ordering Defendants to refrain from further violations of the California Business and Professions Code.

228.   Canoo is further entitled to restitution of monies wrongfully acquired by Defendants as well as all funds expended by Canoo as a result of Defendants' acts and practices of unfair competition.

**FOURTEENTH CAUSE OF ACTION**
**Unjust Enrichment**
**(Against Harbinger)**

229.   Canoo incorporates and realleges the allegations set forth above as if fully set forth herein.

230.   As a result of the illegal and wrongful conduct alleged herein, Harbinger has been and will be unjustly enriched at the expense of Canoo.

231.   Harbinger is under an obligation to repay Canoo all monies and financial benefits it gained and by which Harbinger was unjustly enriched as a result of the wrongful conduct discussed herein.

232.   Canoo is informed and believes, and on that basis alleges, that Harbinger has been unjustly enriched in an amount to be proven at trial.

**FIFTEENTH CAUSE OF ACTION**
**Specific Performance**
**(Against Harbinger, Eberts, Weicker, Fielkow, and Charbonneau)**

233.   Canoo hereby repeats and incorporates by reference the allegations set forth above.

234.   As discussed above, Canoo and the Former Canoo Executives executed the Employment Contracts (enforceable contracts) that are sufficiently certain in their terms; namely, the Former Canoo Executives agreed to assign to Canoo, all

inventions (and all intellectual property associated therewith) that they created and/or developed while employed at Canoo.

235.   Canoo has performed all of its obligations under the Employment Contracts, except to the extent that such performance has been prevented, hindered, excused, and/or waived by the Former Canoo Executives.

236.   The Former Canoo Executives have refused to comply with the terms of the Employment Contracts by among other things refusing and/or failing to assign to Canoo, the inventions, developments and associated intellectual property that they created and/or developed while employed at Canoo.

237.   Canoo has no adequate remedy at law because the inventions, developments and associated intellectual property in issue are unique.

238.   Canoo prays that the Court order the Former Canoo Executives to specifically perform under the Employment Contracts (i.e. the Confidentiality Agreement and Separation Contract) by transferring to Canoo, all of the inventions, developments and associated intellectual property that they created and/or developed while employed at Canoo.

### <u>REQUEST FOR INJUNCTIVE RELIEF</u>

239.   Canoo incorporates and realleges the allegations set forth above as if fully set forth herein.

240.   Canoo demonstrated, and the evidence to be presented at a hearing and/or trial will show, that Canoo has a likelihood of success on the merits of one or more of its claims set forth in its Complaint.

241.   In addition, Canoo will be irreparably harmed without injunctive relief that restores the status quo ante between Canoo and Defendants before Defendants committed one or more of the wrongful acts described in this Complaint.

242.   Canoo has no adequate remedy at law for the ongoing and threatened conduct in that it would be impossible for Canoo to determine the precise amount of damages Canoo will suffer if Defendants' conduct is not restrained, and Canoo will

continue to be deprived of certain employees, vendors, and customers which cannot be compensated in damages.

243.   A balancing of the equities favors the entry of injunctive relief upon a hearing before the Court, in favor of Canoo and, without the entry of such relief, Canoo will suffer a greater hardship than Defendants would suffer if such relief were entered.

244.   It is in the public interest that confidential information remains protected and that the integrity of protected information remains intact, rather than the alternative—unabated breaches of confidentiality agreements and continued disclosures of confidential and trade secret information.

## **DEMAND FOR RELIEF**

**WHEREFORE**, Plaintiff Canoo Technologies, Inc. asks this Court to enter Judgment against the Defendants as follows:

1.     For compensatory damages in an amount to be determined at trial together with interest thereon at the legal rate;

2.     For punitive and exemplary damage in an amount appropriate to punish or set an example of Defendants;

3.     For disgorgement of all monies unjustly received by Defendants at the expense of Canoo;

4.     For an accounting of all gains, profits, and advantage derived from Defendants' unlawful conduct;

5.     For an Order assigning to Canoo all inventions developed by the Former Canoo Executives, including but not limited to Harbinger's technology and any inventions related thereto;

6.     For preliminary and permanent injunctive relief ordering Defendants to refrain from using or disclosing all trade secrets of Canoo in their possession, custody, or control;

/ / /

7.    For preliminary and permanent injunctive relief ordering Defendants to refrain from further violations of the Business and Professions Code;

8.    For preliminary and permanent injunctive relief ordering Defendants to refrain from hiring and/or engaging Canoo employees or independent contractors who are subject to enforceable contracts with Canoo;

9.    Preliminary and permanent injunctive relief prohibiting any further wrongful possession, disclosure, and/or misuse of Canoo's Trade Secrets and confidential information, and preventing Defendants from profiting or benefiting from their wrongful conduct;

10.    Ordering Defendants return to Canoo (and purge from their possession, custody, and control) any and all documents, computer-based files or data, or information in any form, whether originals, copies, compilations, or derivations, that were removed from Canoo or Canoo-owned computers issued to the Former Employee Defendants by Canoo, or which were obtained by Defendants or anyone acting on their behalf or in concert with them;

11.    An order that Defendants return any and all of Canoo's Trade Secrets and Confidential Information, and an order prohibiting any further use or benefit from the use of such information;

12.    For Canoo's attorney's fees and costs;

13.    For prejudgment and post judgment interest at the maximum legal rate, as provided by the laws of the state of California, as applicable;

14.    For specific performance ordering the Former Canoo Executives to (i) return to Canoo, all confidential information and trade secrets owned by Canoo; and (ii) assign to Canoo, all of the inventions and associated intellectual property that they created and/or developed while employed at Canoo; and

/ / /

/ / /

/ / /

15. For such other and further relief as the Court deems just and proper.

Dated: March 24, 2023                     **MUNCK WILSON MANDALA, LLP**

By: */s/ Yael Tobi*
Yael Tobi
William A. Munck (*Pro Hac Vice*)
Ursula Smith (*Pro Hac Vice*)
Aaron B. Gottlieb (*Pro Hac Vice*)

Attorneys for Plaintiff
Canoo Technologies, Inc.

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury of all issues so triable.

Dated: March 24, 2023                    **MUNCK WILSON MANDALA, LLP**

By:   */s/ Yael Tobi*
Yael Tobi
William A. Munck (*Pro Hac Vice*)
Ursula Smith (*Pro Hac Vice*)
Aaron B. Gottlieb (*Pro Hac Vice*)

Attorneys for Plaintiff
Canoo Technologies, Inc.